## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **SUSAN V. WALLACE,** | ) | **18-cv-6525 (RA)** |
| *Plaintiff* | ) | |
| | ) | **FIRST AMENDED COMPLAINT** |
| | ) | |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **DEPARTMENT OF THE ARMY,** | ) | |
| *Defendant* | ) | **OCTOBER 16, 2018** |

<u>JURISDICTION AND VENUE</u>

1.    This action for monetary damages, statutory and equitable relief arises under the
      Rehabilitation Act of 1973, Title 29 United States Code §§ 701, 501, 504; Title I of the
      Americans With Disabilities Act of 1990, Title 42 United States Code §§ 12101, <u>et</u> <u>seq</u>.,
      amended by the ADA Amendments Act of 2008, P.L. 110-32; Family and Medical Leave
      Act of 1993, Title 29 United States Code §§ 2601, <u>et</u> <u>seq</u>.; Age Discrimination in
      Employment Act, Title 29 United States Code §§ 621, <u>et</u> <u>seq</u>.; Title VII of the Civil
      Rights Act of 1964, the Civil Rights Act of 1991, Public Law 102-166, Title 42 United
      States Code § 2000e; Civil Service Reform Act, Title 5 United States Code § 7703(b)(2);
      the Uniformed Services Employment and Reemployment Rights Act; Title 38 United
      States Code §§ 4301, <u>et</u> <u>seq</u>., as amended by the Veterans Opportunity to Work / Hire
      Heroes Act of 2011, Public Law 112-56.

2.    This Court has jurisdiction of this controversy by virtue of Title 29 United States Code §§
      701, 501, 504; Title 42 United States Code §§ 12101, <u>et</u> <u>seq</u>., amended by the ADA
      Amendments Act of 2008 (P.L. 110-325); Title 29 United States Code §§ 2601, <u>et</u> <u>seq</u>.;
      Title 29 United States Code §§ 621, <u>et</u> <u>seq</u>.; Title 42 United States Code § 2000e; Title

VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, Public Law 102-166; Title 5 United States Code § 7703(b)(2); Title 38 United States Code §§ 4301, et seq., as amended by the Veterans Opportunity to Work / Hire Heroes Act of 2011, Public Law 112-56.

3.      Venue in this District is proper pursuant to Title 5 United States Code §§ 7702, 7703(b)(2), Title 28 United States Code §§ 1391 (b), 1392(a), Title 42 United States Code § 2000e-5(f)(3) 5 Code of Federal Regulations part 1201, subpart E, § 1614.310, because at all times relevant herein, the acts complained of were carried out primarily in Defendant's workplace at 26 Federal Plaza, New York, New York.

## PARTIES

4.      At all times relevant herein, Defendant DEPARTMENT OF THE ARMY (a/k/a "the Agency") has been an agency of the U.S. Department of Defense, operating a unit known as the U.S. Army Corps of Engineers ("USACE") headquartered in Washington, D.C. with a New York District office at 26 Federal Plaza, New York, New York, and a North Atlantic office on Fort Hamilton, Brooklyn, NY, and has been an employer subject to all laws, regulations and policies relevant hereto.

5.      At all times relevant herein, Plaintiff SUSAN V. WALLACE has been an adult U.S. citizen and resident of the Borough of Brooklyn, City of New York, State of New York.

6.      Plaintiff's sex is female.

7.      Plaintiff's age at removal was 59 years and 10 months, born in 1958.

8.      At all times relevant herein, Plaintiff has been a person with one or more qualifying disabilities and a history of disability or perceived as having a disability: cardiac atrial fibulation and other heart arrythmias and mitral and tricuspid valve prolapse diagnosed in

2013 and earlier; PTSD, Depression, Anxiety (diagnosed in 2013 and earlier); and Bipolar Disorder I (diagnosed May 2016).

9.  From May 6, 2010 to April 15, 2017, Plaintiff was employed by Defendant as an Excepted Service General Attorney position in the General Service, assigned to its USACE unit at 26 Federal Plaza, New York, New York from December 2010 to April 15, 2017. That employment ended by Defendant's removal of Plaintiff effective April 15, 2017 for the alleged reason of "medical inability to perform."

10. At all times, Plaintiff has been otherwise qualified to perform the essential functions of her former position with USACE with or without reasonable accommodation.

11. Plaintiff was hired by USACE with over 20 years private practice experience mostly in labor and employment law, and over 17 years as a Commissioned U.S. Army military Officer and lawyer (Judge Advocate General Officer, "JAG").

12. Plaintiff continued to serve as an Army reserve JAG Officer throughout her employment with USACE and beyond, for a total of 25 years, from April 1993 to June 2018, until she attained the maximum service age (60) and had a non-medical retirement.

<u>COMPLIANCE WITH ADMINISTRATIVE REQUIREMENTS</u>

13. Employer internal EEO complaint process: From February 2016 to February 2017, Plaintiff complied with Defendant's internal EEO complaint process, alleging unlawful discrimination on the bases of disability, age (then-59 years), sex (female), harassment, and retaliation for protected EEO activities. Defendant asserted that it forwarded the casefile to the Office of Federal Operations of the U.S. Equal Employment Opportunity Commission ("EEOC") in February 2017. Despite repeated requests to Defendant and EEOC for the status and a hearing, all Plaintiff has been given is a docket number.

14. Whistleblower reprisal complaint: In mid-2016, Plaintiff filed a complaint of reprisal for protected communications to the U.S. Office of Special Counsel which declined further action because Defendant had not yet removed Plaintiff.

15. Administrative appeal of adverse action: Plaintiff timely appealed the removal to the New York Field Office of the U.S. Merit System Protection Board ("MSPB") with affirmative defenses: unlawful discrimination on the bases of age, sex, disability and failure to provide reasonable accommodation, harassment, retaliation for protected Equal Employment Opportunity activities, and reprisal for protected communications/"whistleblowing." The Administrative Judge dismissed all for "lack of jurisdiction" based on "failure to plead," except that part of the defense of disability discrimination based on failure to provide reasonable accommodation then dispose of that by upholding the removal by decision dated June 19, 2017.

<u>FACTS</u>

16. Titles or actions herein are for ease of reference, and facts pleaded may support any claim or affirmative defense.

17. USACE New York District ("CENAN") is located at 16 Federal Plaza, City of New York, New York County, State of New York.

18. USACE North Atlantic Division ("CENAD") is located on Fort Hamilton, City of New York, Kings County, State of New York, and is the next higher command over New York District.

19. USACE Headquarters ("HQ") is in Washington, DC and is the higher command over New York District and North Atlantic Division.

20. LORRAINE LEE, District Counsel USACE New York (GS15), was and is assigned at 26

Federal Plaza, New York, New York, and was Plaintiff's immediate supervisor.

21. MAUREEN MCANDREW, USACE North Atlantic Division Counsel (GS15), was and is assigned at Fort Hamilton, and LEE's supervisor and Plaintiff's second tier supervisor.

22. LEAH SERRANO, General Attorney (GS13) assigned to USACE Humphries Center, Alexandria, VA, known as "HECSA" handled the Agency response to Plaintiff's requests for reasonable accommodation, defense of the Agency against Plaintiff's EEO complaint, creation of "evidence" for removal of Plaintiff, the removal, and defense of the Agency against Plaintiff's appeal of the removal and affirmative defenses.

23. SHELLY TURNER, USACE Deputy Chief Counsel (SES) assigned to USACE HQ, Washington, DC.

24. JOSEPH FALVEY, District Counsel, Detroit, MI District.

25. SUZANNE MITCHEM, District Counsel, Nashville, TN District.

26. DANIEL MURRAY, USACE Deputy Chief Counsel (SES) assigned to USACE HQ, Washington, DC, and "Deciding Official" on actions against Plaintiff.

27. DAVID COOPER, USACE Chief Counsel (SES), assigned to USACE HQ, Washington, DC.

28. ESTELLE CAPOWSKI, supervisory EEO Officer (GS13) assigned to New York District office at 26 Federal Plaza, New York, New York, retired mid-2016.

29. RICHARD HARRIS, EEO Officer (GS13) assigned to USACE Humphries Center "HECSA," Alexandria, VA.

30. EARL A. NEWTON, EEO Officer (GS13) assigned to USACE HQ, Washington, DC.

31. JAMES BRAXTON, supervisor of all USACE EEO operations (SES) assigned to USACE HQ, Washington, DC.

32. DIANE DEPTULA, supervisory Human Resources Officer (GS13) assigned to New

York District, 26 Federal Plaza, New York, New York, retired mid-2016.

33. MELISSA NEWMAN, Human Resources Specialist assigned to U.S. Army CPOL, Tobyhanna Army Depot, PA.

34. PHILIP F. DEMARAIS, chief of U.S. Army CHRA Northeast civilian Human Resources (GS15) assigned to Aberdeen Proving Ground, MD.

35. COL JOHN BOULE, Commander of USACE New York District military and civilian personnel 2010 to 2012, direct supervisor of LEE, CAPOWSKI, DEPTULA and others, retired 2012.

36. COL MICHAEL CLANCY was Deputy Commander of USACE New York District military and civilian personnel from 2010 to 2013, direct supervisor of LEE, CAPOWSKI, DEPTULA and others.

37. COL PAUL OWENS, Commander of USACE New York District military and civilian personnel, 2012 to 2015, direct supervisor of LEE, CAPOWSKI, DEPTULA and others.

38. LTC JOHN KNIGHT, Deputy Commander of USACE New York District military and civilian personnel, 2012 to 2015, direct supervisor of LEE, CAPOWSKI, DEPTULA and others.

39. COL DAVID CALDWELL, Commander of USACE New York District military and civilian personnel, 2015 to 2017, direct supervisor of LEE, CAPOWSKI, DEPTULA and others.

40. MAJ JAMES CURLEE, Deputy Commander of USACE New York District military and civilian personnel, 2015 to 2016, direct supervisor of LEE, CAPOWSKI, DEPTULA and others.

41. LTG THOMAS G. BOSTICK, Commanding General of all USACE military and civilian

personnel, retired circa early 2016.

42. LEE and MCANDREW gave Plaintiff all excellent GS performance evaluations and awards.

43. Throughout her tenure with the Agency, Plaintiff had good attendance.

44. The Agency never gave Plaintiff a Performance Improvement Plan or other means to improve any alleged incapability to perform.

45. The Agency did not offer Plaintiff other positions in lieu of or before removal.

46. The Agency had no exigency or compelling need to remove Plaintiff when it did, or at all.

<u>PROTECTED COMMUNICATIONS AND EEO ACTIVITIES</u>

47. From 2011 until removed, Plaintiff reported serious misconduct such as violations of Ethics rules, potential crimes, unlawful discrimination, harassment, hostile environment primarily committed variously by LEE, MERCER, MCANDREW, CAPOWSKI, DEPTULA, FERNANDEZ, LAU, TAVALARO, BOULE, OWEN, CLANCY, KNIGHT, CURLEE. Plaintiff also complained of, retaliation and whistleblower reprisal against her for the aforesaid reporting. As to reports/complaints Plaintiff made within USACE, variously to LEE, MCANDREW, Chief Counsel COOPER, TURNER, MURRAY, CLANCY, KNIGHT, CURLEE, OWEN, CALDWELL, the North Atlantic regional Commander, and Internal Review Officer MONTAGNE. Plaintiff made numerous reports and complaints of the aforesaid subjects by email and orally.

48. 2012, 2013, 2016, Plaintiff made discrete reports and complaints of the aforesaid malfeasance in writing with proof to Chief Counsel COOPER, his predecessor, their Ethics lawyer, the "Inspector General" (informal IG, no statutory authority).

49. By lack of response and in written statements from USACE IG, the Agency refused to investigate or correct anything from 2012 on.

50. December 2014 Plaintiff reported misconduct and mismanagement by LEE and complained of discrimination, harassment, hostile environment, retaliation by phone to MCANDREW.

51. 2013 and 2014 Plaintiff contacted Army General Counsel Ethics Counsel by phone and tried to provide her what Plaintiff previously reported to then-Chief Counsel and his Ethics lawyer and was merely turned back to the persons she was complaining about.

52. The Agency ignored the EEO complaints that Plaintiff submitted whether in a discrete document or email from 2012 to 2015.

53. Everyone that Plaintiff complained to did not respond, did nothing to help, or refused to investigate or correct anything.

54. Mid March 2016, Plaintiff informed Federal law enforcement agents of what she knew of potential crimes by USACE officials and attorneys LEE and MCANDREW which she had tried to report to the Agency and suffered reprisal As alleged elsewhere herein, LEE and MCANDREW, being the subjects, successfully conspired with together and with USACE Chief Counsel's office to obstruct that investigation.

55. Plaintiff could not file an EEO complaint with the New York EEO officer CAPOWSKI who was her harasser and who filed her own complaint about Plaintiff in 2016. No one informed Plaintiff that Agency policy is that all complaints of any kind involving its attorneys are handled by its HECSA, VA, office. Only Plaintiff's 2016 EEO complaint was handled there. CAPOWSKI did not comply and prepared three complaints about Plaintiff which were required to be sent to HECSA. LEE allowed it and did not inform

Plaintiff that these were required to be handled by HECSA.

56. 2016 Plaintiff complained numerous times to the chief of all USACE EEO operations, JAMES BRAXTON starting with the failure to provide her a counselor and letting her complaint languish. He was unresponsive.

57. Plaintiff's aforesaid reports and complaints in any form were protected communications/protected whistleblowing and/or protected EEO activities under Title VII, 42 U.S.C. § 2000e, et seq., amended by the Civil Rights Act of 1991, and satisfied any complaint filing, notice and timeliness requirements for administrative exhaustion and jurisdiction in the instant action.

58. All the USACE military command officers identified herein had direct nondelegable responsibility by law and the Army Command Regulation to proactively ensure a non-hostile work climate for every employee, free of crime, violence, discrimination, harassment, retaliation, reprisal, and USERRA violations.

59. Plaintiff's officially assigned duties as an Agency General Attorney and JAG Officer included representing the Agency and advising managers, EEO and HR officials on compliance with labor and employment, Equal Employment Opportunity, Ethics, and criminal laws, regulations, rules, and policies, including identifying and reporting evidence of unauthorized and unlawful activities to higher management, inspectors, and law enforcement.

60. In carrying out her duties for the New York USACE office, Plaintiff encountered evidence and information of unauthorized and unlawful activities by CAPOWSKI, LAU, DEPTULA, FERNANDEZ, BOULE, LEE, one of LEE's staff attorneys, and MCANDREW.

61. Early in Plaintiff's employment in the New York office, at LEE's express direction, she emailed CAPOWSKI about the Ethics rule prohibiting use of official position to endorse private entities. Plaintiff and CAPOWSKI had not met yet. CAPOWSKI responded with walking into LEE's office, where Plaintiff and LEE were speaking, and starting a unilateral raging profane tirade with "What the fuck is this?" referring to a copy of Plaintiff's email in her (CAPOWSKI's) hand. CAPOWSKI made an extended profane tirade objecting to be subjected to Ethics rules and demeaned Plaintiff who did not know who she was at first. LEE did nothing to protect Plaintiff.

62. In time Plaintiff and others reported CAPOWSKI for misusing her Federal position to engage in unlawful and unethical activities, such as prohibited endorsements, unauthorized sales of commercial tickets, controlling funded programs she was not authorized for, failing and refusing to disclose and account for funds, steering agency activities to family members, obtaining confidential information about employees without authorization, and using her position to make baseless EEO complaints for illegitimate purposes.

63. CAPOWSKI relentlessly pursued harming and ousting Plaintiff, including but not limited to by:

   a. Severely and pervasively harassing Plaintiff by defaming her to coworker and persons outside the Agency by profane disparaging emails about Plaintiff and attacking Plaintiff in meetings;

   b. Disrupting meetings to force Plaintiff out, refusing to meet with her even in large groups;

   c. Misusing her EEO position to induce employees to file baseless complaints about

Plaintiff;

d.   Attacking Plaintiff for advising management contrary to what CAPOWSKI wanted, which Plaintiff had legal immunity and duty to do;

e.   Several violent attacks on Plaintiff, throwing objects, kicking, slamming, shoving or tossing furniture at her, slamming doors by her;

f.   After minimal to no contact with Plaintiff for two years, in January 2016, CAPOWSKI acted with LAU, DEPTULA, FERNANDEZ, LEE and CURLEE to put forward a false story of being in mortal fear of Plaintiff, providing a false justification for CURLEE and LEE to direct Plaintiff to stay at such a distance from the "C/L/D/F women" that Plaintiff was effectively barred from working in the New York office, and subjected to skyrocketing stress and distress;

g.   Upon her retirement mid 2016, when Plaintiff was in and out of the hospital from what CAPOWSKI et al. inflicted on her, CAPOWSKI had her long time superior the Headquarters EEO Officer NEWTON harass Plaintiff and her military commander with another baseless EEO complaint they created to allow CAPOWSKI to continues to harass Plaintiff in retirement. This complaint alleged that Plaintiff's use in her then-draft EEO complaint of the term "tossed," and no more, to describe how CAPOWSKI angrily propelled a chair toward Plaintiff in 2012 (in the presence of LAU, DEPTULA, FERNANDEZ, CLANCY, and the other labor and employment attorney) is "harassment" and created a hostile environment for CAPOWSKI. That allegation is frivolous, and there has yet to be a sworn or plain denial of the underlying conduct by CAPOWSKI;

h.   CAPOWSKI had no authority to access Plaintiff's confidential draft EEO complaint

and to have her higher EEO Officer NEWTON acting under conflict for her against Plaintiff as alleged elsewhere herein.

64. CAPOWSKI's accusations about Plaintiff have not had a bona fide investigation or hearing. CAPOWSKI's words and acts were severe and pervasive harassment, retaliation/reprisal, created a hostile work environment for Plaintiff, and violated USERRA.

65. Plaintiff reported that LAU gave a false statement to deny witnessing a Union representative lunge at Plaintiff and have to be stopped by the Security chief. LAU made false denials of several violent raging attacks on Plaintiff by CAPOWSKI and FERNANDEZ.

66. Plaintiff reported that DEPTULA made a false statement under penalty of perjury to get an employee, a Veteran, removed by putting her on a disability pension that she did not qualify for or want. DEPTULA and CAPOWSKI wanted to destroy the document. Plaintiff advised they could not but to not pursue it or submit an accurate statement.

67. Thereafter LEE and MCANDREW detained Plaintiff several hours after work trying to coerce her to go alone behind closed doors with DEPTULA and receive instructions on what to do to get her out of trouble. LEE and MCANDREW were agitated and gave no transparency for this bizarre request of an agency lawyer, and Commissioned Officer. Plaintiff declined, whereupon MCANDREW threatened that "everyone" is going to lose their jobs if the senior HR SES finds out. Plaintiff said she wasn't a part of whatever they were doing and her duty was to the Agency. Undeterred by such duties, they pressured Plaintiff for a few weeks and she stood firm. DEPTULA became retaliatory giving false statements about Plaintiff being incompetent and helping to remove her duties.

68.     FERNANDEZ made several violent profane attacks on Plaintiff and acted with
        CAPOWSKI to disrupt meetings to intimidate Plaintiff to leave; and participated in
        fabrication the claim that she "feared for her life" from Plaintiff as a "violent threat" to
        keep Plaintiff removed from work with her and the New York office. Plaintiff reported
        this.

69.     In 2012, Plaintiff observed LEE, MCANDREW and MERCER committing Federal
        crimes and Ethics violations to further and conceal Federal crimes and Ethics violations
        by eachother and the commander BOULE, backdating, creating false documents, making
        up facts to cover felonies that had eyewitnesses report them. They directed Plaintiff to
        falsify with them, she refused and reported it, to no avail.

70.     In 2012 CAPOWSKI did a violent attack on Plaintiff with numerous witnesses including
        CLANCY, MERCER, DEPTULA, FERNANDEZ, LAU.

71.     Plaintiff urged CLANCY who was then-Deputy Commander, and LEE to have the
        commander order an investigation. Plaintiff repeatedly asked MERCER for a witness
        statement for an investigation and for Plaintiff to seek protection. She asked LEE to
        direct MERCER to do it. They lied to Plaintiff to waste time and gave her no help. For
        three years, Plaintiff made requests to CLANCY, KNIGHT, OWEN, all senior rank
        officers, to investigate, to no avail.

72.     Fall 2015 Plaintiff found hard copies of emails between MERCER and CLANCY with
        that lawyer expressly colluding to destroy evidence of CAPOWSKI's violent attack on
        Plaintiff in CLANCY's office. They had gathered witness statements by email. They
        apparently destroyed them to obstruct investigation and left Plaintiff unprotected from
        violence and reprisal. They would not have needed to lie to Plaintiff and destroy that

evidence unless it corroborated Plaintiff's report. LEE was part of it.

73.   CAPOWSKI's 2016 EEO complaint about Plaintiff incredibly alleged that particular

violent incident where the evidence was destroyed. Four years after the incident, upon her

retirement, CAPOWSKI accused Plaintiff of making false reports of the incident.

Specifically, inaccurately describing the method CAPOWSKI used to propel a chair at

Plaintiff.

74.   CAPOWSKI controlled the Employee Assistance Program, which is not authorized under

OPM regulations. CAPOWSKI made an unlawful contract giving herself prohibited

access to identities of employees who seek counseling and confidential information. This

was not the first time. She located the counselors in the copier room outside her office

and HR so employees seeking counseling are visible. In Plaintiff's first and only

counseling session on or about October 2015, her other violent harasser MERCEDES

FERNANDEZ entered from the HR office.

75.   By October 2014, CAPOWSKI, DEPTULA, FERNANDEZ, LAU ("C/L/D/F") did not

like what Plaintiff was advising some supervisors about employees and wanted Plaintiff

removed from two employees' cases involving several matters, and a substantial

workload. The supervisors wanted Plaintiff to continue. CAPOWSKI used her EEO

position to get the two employees to sign vague frivolous complaints about Plaintiff.

LEE, MCANDREW, DEPTULA, CAPOWSKI came together to take the files from

Plaintiff. Plaintiff tried to explain that under labor and employment law she had immunity

and it was improper or her to recuse. MCANDREW and LEE dismissed that and directed

Plaintiff not to call it recusal because the Agency has a process for that they were not

using.

76.    They gave the two case files and the two EEO complaints about Plaintiff to the youngest male attorney. There was no transition. LEE did not respond to Plaintiff's offers to train the new attorney. He stayed away from Plaintiff. These were ordinary cases. There was nothing in those working files that Plaintiff could not know.

77.    Upon information and belief, one of the EEO complaints about Plaintiff resolved or dismissed. Plaintiff gave a declaration in the other in October 2016 - the first time the Agency included Plaintiff, in a reinvestigation ordered by EEOC.

78.    Through 2015, Internal Review Officer MONTAGNE was investigating CAPOWSKI's mishandling of funds and recommending referral to other authorities and command corrective action. Deputy Commander CURLEE knew that Plaintiff knew about that. LEE was legal advisor to the command officers and CAPOWSKI.

AGE AND SEX DISCRIMINATION

79.    When MERCER retired circa January 2014, Plaintiff became the oldest attorney doing labor and employment and Ethics in the New York office.

80.    In 2014, LEE and MCANDREW made overt comments to and around Plaintiff about their intention to get rid of "old" lawyers and hire "only" the youngest civilian lawyers possible who were more fit, etc. Plaintiff advised them this was blatant unlawful age and possibly disability discrimination. Their responses were assertions that this is official policy of USACE Chief Counsel COOPER, and sarcastic humiliating personal attacks on Plaintiff.

81.    MCANDREWS was doing similar against at least two lawyers aged 50s in the Philadelphia office under her supervision. Both lawyers filed EEO complaints of age and disability discrimination. At least one prevailed in EEOC with findings that

MCANDREW committed not just age and disability discrimination and denial of reasonable accommodation, but that she committed such severe harassment that she caused his strokes.

82. About mid 2014, LEE hired a male attorney age early 20s with no practice experience two years out of law school, no knowledge or interest in labor and employment law to replace the retiring male labor and employment counsel.

83. Starting on or about Spring 2014, LEE and MCANDREW gave the retired lawyer's labor and employment law and Ethics work New York and the IT unit, and Plaintiff's labor and employment law and Ethics work for New York, to the probationary young and least experienced male attorney in the office.

84. The work assigned to the youngest lawyer included the IT unit telework. Upon information and belief, he does not have a disability and did not request telework as reasonable accommodation.

85. October 2014 LEE and MCANDREW also gave the youngest attorney two employee casefiles involving several active matters which they took from Plaintiff, who was then the second oldest staff attorney, on the pretense that these employees filed EEO complaints about her.

86. By about late 2014 or early 2015, LEE and MCANDREW were expressly announcing that USACE Chief Counsel's policy is to only young attorneys and no more "old" attorneys. They made overtly ageist comments to Plaintiff in front of her all younger coworkers: the Agency "does not need old lawyers," "is hiring only young lawyers," "the younger the better."

87. The Army's civilian lawyer recruitment advertising expressly seeks "young" lawyers

with photos of only age 20s males. USACE Chief Counsel advertised an attorney recruitment program that with rare exception will disproportionately hire age 20s to under age 40 and operates a different recruitment program for "older" lawyers.

88. 2015 as career experienced labor and employment lawyer, Plaintiff advised LEE and MCANDREW several times that the actions and statements regarding age of attorneys, as for almost all other employees, are likely unlawful age discrimination, and capable of denying employment to attorneys with federal hiring preferences, such as the several preferences for Veterans and relatives of Veterans and of deceased Servicemembers. LEE and MCANDREW rebuked Plaintiff and said Chief Counsel may not be questioned.

89. In late 2015, LEE then hired the third consecutive attorney under age 40, the third in a row aged 20s. LEE has not hired a lawyer over age 40 since Plaintiff in 2010.

90. Late 2015, Plaintiff then age 58 was the oldest staff attorney in New York District by several years. LEE and MCANDREW knew she had no intention of retiring soon. LEE, MCANDREW, and Headquarters counsel set about escalating harassment and fabricating justification to force Plaintiff to quit or remove her and replace her with the youngest lawyer they could get.

91. Early February 2016, LEE reassigned Plaintiff's labor and employment law and Ethics work for the IT unit to the youngest and least experienced attorney in the office, an age young 20s male. Upon information and belief, that attorney did not have a disability, but LEE gave him the IT unit telework that could provide reasonable accommodation for Plaintiff's disabilities because it was all telework. That was unlawful age, sex, disability discrimination and refusal to provide reasonable accommodation.

USERRA DISCRIMINATION, HARASSMENT, RETALIATION

92.    January 2015, Plaintiff's son was severely injured on Active Duty with the Army. He is now VA rated 80% service-connected disabled.

93.    Plaintiff thereafter told LEE, her deputy, DEPTULA, and a few other coworkers how he was severely injured at 18 years old, hazed, denied medical treatment, and summarily discharged from the Army by the perpetrators without process and benefits. LEE, her deputy, and coworkers were aware of the son's four hip and pelvic surgeries and care because Plaintiff took leave. Plaintiff later told some command officers KNIGHT and CURLEE and Mr. MONTAGNE.

94.    With rare exception, no coworkers in the legal office spoke with Plaintiff about her son. Upon information and belief LEE directed them not to. LEE and her deputy, whose spouse was a senior New York District manager and West Point graduate, told Plaintiff her son should not ask the Agency for anything. LEE said not to blame the Army, it would have happened anyway. What these two supervisors said is not the truth.

95.    Fall 2015, a coworker who is an Army Veteran nurse, married to another Army Veteran, living in Plaintiff's neighborhood, had met Plaintiff's son, and inquired about him. The coworker lost her son in a tragic accident the year before. The coworker gave Plaintiff tips on coping with an injured or lost child. It was a calm humane conversation. FANG was in the next likely overhearing.

96.    Shortly later LEE harassed Plaintiff over the conversation about her son. LEE directed Plaintiff to never discuss her son because it is "depressing" and "disloyal to the Army." LEE said unnamed coworkers are "offended." That is harassment, disability discrimination, a USERRA violation, and a violation of Agency and OPM policies about resilience and caregiver support.

97.    The Agency did not give Plaintiff the Employee Assistance Program and the Federal
       employee caregiver support program both of which CAPOWSKI controlled contrary to
       OPM regulations.

98.    In November 2015, Plaintiff discovered that the persons who harmed her son were
       USACE officers. CURLEE promised Plaintiff to contact the USACE Commanding
       General about it. Informing LEE first, Plaintiff wrote to the General requesting
       investigation, correction and caregiver support. The General and his Colonel refused any
       help and communication, contrary to Agency and OPM rules and policies. From this
       point forward, the Agency's harassment and actions to oust Plaintiff escalated quickly.

99.    2014, Summer and Fall 2015, Plaintiff reported the misconduct, discrimination,
       harassment, retaliation/reprisal alleged herein and removal of her duties to Internal
       Review Officer KEITH MONTAGNE and Deputy Commanders KNIGHT then
       CURLEE. MONTAGNE did a preliminary investigation and provided the commander
       notes and evidence of wrongdoing by at least CAPOWSKI, DEPTULA and LEE.
       MONTAGNE had three meetings with Plaintiff and the Deputy Commanders in which he
       strongly advised the command to investigate, protect Plaintiff, restore her duties.

100.   2014-15 the command refused to investigate or correct anything.

101.   Late 2015, CURLEE intensely promised he would. He did not, and instead committed
       severe harassment and reprisal against Plaintiff.

102.   Throughout the second half of 2015, Plaintiff was candid with LEE and the Command
       LEE, CURLEE, and the Internal Review Officer MONTAGNE about experiencing
       severe stress and exhaustion from the severe and pervasive harassment and
       retaliation/reprisal and hostile workplace, and what had happened to her son on Active

Duty. She requested the Employee Assistance Plan for mental health assistance and reasonable accommodation. The Agency had sufficient information to engage in an interactive process for reasonable accommodation, but did not.

103.  As soon as KNIGHT and OWEN left New York District, LEE, CURLEE and the new Commander CALDWELL began a campaign to paint Plaintiff as a "violent threat" to force Plaintiff to quit or fabricate justification to remove her.

104.  LEE, CURLEE, CALDWELL had sufficient information to know that Plaintiff did not pose a risk of violence in the workplace. December 2015, Plaintiff candidly told LEE that she followed through on her own with a therapist under the Agency's military EAP. It is Plaintiff who previously persuaded the command to update its workplace violence policy. KNIGHT had her redraft it for COL OWEN in August 2015.

105.  As soon as KNIGHT and OWEN left New York District, LEE claimed she had complaints by coworkers in the legal office, alternately "everyone" and "a few" and "it might have been one," that Plaintiff spoke loudly on one phone call teleworking with the IT unit. LEE was clear it was about one call and not inappropriate language or conduct. LEE said the coworkers (not the employee on the phone) reported it to her because they fear Plaintiff might be violent when she raises her voice. At that time, Plaintiff had been working in that office some six years and had never heard such complaints, nor in her many military positions with the Agency.

106.  It is not reasonable to conclude that once speaking loudly in an otherwise ordinary business phone call poses a risk of workplace violence.

107.  LEE intentionally keeps that office notoriously loud by keeping everyone crowded in cubicles. For five years, LEE had Plaintiff working by noisy office equipment and foot

traffic where she couldn't hear her phone conversations. LEE has no limit on her own volume, hold conversations yelling across the office, impromptu meetings next to employees. LEE knew that Plaintiff often wore earplugs or headphones and made suggestions to LEE for noise reduction, which LEE refused to even consider, saying employees learn by hearing each other work. Based on the history, LEE was fabricating for her "violent threat" scheme remove Plaintiff. It was harassment, retaliation/reprisal.

108.  In response to LEE's attempt to paint one loud phone call into a "violent threat," Plaintiff candidly told her cubicle neighbors that she will not take offense if they tell her she is too loud, whereupon attorney RITA FANG sprang from her cubicle in a rage, screaming insults at Plaintiff and otherwise incoherent, pacing up to Plaintiff red-faced, waving fists, in LEE's office. That was a real threat of workplace violence. Plaintiff stood still and did not act in kind and asked LEE to make it stop. LEE did not.

109.  FANG went straight to CAPOWSKI and initiated an EEO complaint alleging Plaintiff committed sex discrimination. LEE was a direct witness to that being utterly baseless. CAPOWSKI had no authority to accept such a complaint. LEE made the complaint end, but continued trying to paint Plaintiff as a violent threat.

110.   Late 2015, CURLEE made several strongly worded promises to Plaintiff and Internal Review Officer MONTAGNE that the command was going to order LEE to restore Plaintiff's labor and employment law and Ethics duties for New York District.

111.  January 2016, CURLEE and LEE met with Plaintiff ostensibly to restore her labor and employment law and Ethics duties. Instead they refused with cruel abuse, literally laughing out loud at Plaintiff's humiliation and distress. They said they "could not" restore the duties because CAPOWSKI, LAU, DEPTULA, FERNANDEZ "shed real

tears" each alone with CURLEE begging him to not restore Plaintiff's duties because they "fear for their lives" from her.

112.   CURLEE and LEE gave as the basis for said mortal fear that Plaintiff trained with firearms in the military reserve. That is fairly understood to mean that the purported fear is Plaintiff will shoot them at work. It shocks the conscience, is grossly defamatory, pretextual, harassment, sex and disability discrimination, a USERRA violation.

113.   LEE said Plaintiff is a violent threat and firearms threat knowing it is false and defamatory and intending defamatory and distressing effects. It is harassment, a hostile environment, sex, age disability discrimination, and violates the USERRA.

114.   For about three years before the "fear for the lives" story, "C/L/D/F's" contact with Plaintiff was low to none.

115.   No one in USACE has seen Plaintiff in military uniform.

116.   Plaintiff did not discuss her service or what firearms she has used with any one in USACE.

117.   LEE, MCANDREW, and "C/L/D/F" knew that since 2014, Plaintiff was serving in the Fort Hamilton Legal Office with civilian lawyers, and there is no shooting on Fort Hamilton.

118.   LEE has known since about 2011 that Plaintiff has not owned a firearm since moving into NYC. LEE should reasonable have known that if Plaintiff sought one as a NYC resident, the Agency might find out being contacted for the background investigation.

119.   LEE, MCANDREW, the command officers, "C/L/D/F" knew or should have reasonable known that the likelihood of Plaintiff getting far with a gun near the Federal building would be extremely low.

120.   LEE knew Plaintiff does not own a car and stopped driving years ago so is a low risk of pursuing anybody.

121.   Upon information and belief, no one in the Agency made a report to law enforcement or other authority, or the Bar about Plaintiff posing a "violent" or "firearm threat."

122.   Plaintiff complained since 2011 of severe and increasing distress from the hostile workplace that LEE and the "four" were inflicting. Plaintiff made express requests to LEE, the Commanders, Headquarters Chief Counsel for investigation, curtailment of the wrongdoing, protection, reasonable accommodation.

123.   Long before LEE began the "violent threat" scheme, Plaintiff candidly of her own accord informed LEE and the Commander's Internal Review Officer MONTAGNE of her stress and that she needed reasonable accommodation to obtain mental health care.

124.   MONTAGNE who is a trained investigator spent substantial time with Plaintiff, and repeatedly advised the Command officers to stop the hostile environment against Plaintiff and assessed the accusations that Plaintiff was a "violent threat" to be baseless harassment or retaliation against her.

125.   The Agency did not direct Plaintiff to the Employee Assistance Program for mental health intervention and did not make it reasonably available to Plaintiff who was requesting it through the second half of 2015.

126.   The Agency did not obtain any fitness examination of Plaintiff. OPM Regulations allow these for limited purposes. The Agency had a chance, in Plaintiff's Workers' Compensation claim, but LEE chose to commit perjury to obstruct the claim.

127.   The Agency has been offering a letter from a contract physician in support of its removal of Plaintiff and submitted it to MSPB. The letter is not valid under OPM Regulations as a

medical or mental health opinion, and the content is just the drafter stating why he cannot give an opinion. The letter does not mention Plaintiff being a "violent threat." It notes that the Agency has records showing Plaintiff was subjected to harassment and hostile environment, that no one may be expected to work in such an environment, therefore, he cannot opine on Plaintiff's work ability until the Agency eliminates such environment.

128.    The only firearms discussion Plaintiff had at USACE was about her then-18 year old son being hazed, that an Army Regulation 15-6 investigation documented that two people threatened him with combat rifles pointed at him at close range. Circa October to December 2015, Plaintiff talked to MONTAGNE, CURLEE, and emailed the USACE Commanding General about it. Plaintiff told LEE that she was emailing the General. CURLEE said he contacted the General to seek help for Plaintiff and her son. The General immediately refused any help or communication. Shortly after that, LEE, CURLEE and "C/L/D/F" fabricated the "firearms threat" smear of Plaintiff.

129.    While LEE and the others were concocting the violence story, she and DEPTULA knew that since 2013, Plaintiff advised them and the command officers to improve the workplace violence policy, and Plaintiff worked on it in 2014, and Deputy Commander KNIGHT sought and followed Plaintiff's advice on it in around August 2015, bringing the policy into compliance with OPM. LEE and CURLEE did not mention that policy in relation to Plaintiff.

130.    The facts and evidence known to LEE, MCANDREW, CURLEE, "C/L/D/F" can be fairly summarized as overwhelmingly that there has never been a rational basis to characterize Plaintiff as posing a risk of violence toward the Agency's workplace with firearms or otherwise. It was always only harassment, retaliation/reprisal and a USERRA

violation.

131.    CURLEE, a senior command officer, made at least four false statements to Plaintiff and to Mr. MONTAGNE (who made records): that he (CURLEE) was immediately ordering LEE to restore Plaintiff's duties; that he had a relationship with the General and would work to get Plaintiff correction for her son; and the "mortal fear" and "firearms threat" stories. The truth is the opposite.

132.    At all times relevant herein, LEE, CURLEE, et al. knew they were threatening Plaintiff with the loss of a job she needed to care for her son and her own medical needs.

133.    The Agency maintains a hostile environment and rewards bullying and punishes complaints. Throughout her tenure in the GS in this Agency, Plaintiff was subjected to the following, repeatedly reported it, and with a few exceptions, she was not given protection or correction, instead worse retaliation or reprisal:

a.    Profane raging yelling tirades at her by CAPOWSKI, FERNANDEZ, FANG, with no discipline even sought;

b.    Physical violence of various kinds at her and others, some appearing to be crimes, by CAPOWSKI, FERNANDEZ, LEE, MCANDREW never disciplined, a male Union representative lunged at Plaintiff in the Security Officer, and management minimized and delayed discipline; at least two more male managers allowed violent outbursts for decades. One with a history punched the wall and table around a contractor's face so hard he bloodied his hand and management minimized and delayed discipline;

c.    Cyberbullying by profane demeaning emails, emails saying "shut up" or "go away" when trying to do her job as an attorney by CAPOWSKI and a since-retired senior manager TAVALARO, usually acted with CAPOWSKI, the former Chief of Staff made him stop

a couple of times but no discipline;

134. This bar on Plaintiff included to stay far from any work meeting with anyone no matter the subject where any of "the women" "even might be." They refused to tell Plaintiff how she could know where they "even might be," when these women worked in neighboring offices that Plaintiff had to pass, and shared an assigned women's room, elevators, cafeteria, lobby, etc. CURLEE and LEE laughed out loud and said "I have no choice but to protect the women."

135. Early February 2016 Plaintiff's disabled Army Veteran son underwent hip reconstruction surgery for service-connected injuries, with Plaintiff accompanying him several days in the hospital with complications. Plaintiff had informed LEE weeks in advance and submitted documentation of it for leave.

136. February 22, 2016, Plaintiff emailed a complaint about the Agency's grossly inappropriate and unlawful conduct, as complained of herein, toward her and her complaints, and the malfeasance by LEE, MCANDREW and others. Plaintiff copied LEE, MCANDREW, and Plaintiff's superior labor and employment lawyers. Plaintiff requested investigation and correction including restoration of her duties and protection from harassment and the hostile environment, and reasonable accommodation. Chief Counsel did not respond.

137. Immediately following her emailed complaint, LEE in writing directed Plaintiff that Chief Counsel COOPER directed that she is not permitted to complain to anyone she complained to, which includes him, and instead may communicate with only a few Government complaint avenues available to Plaintiff. That is unconstitutional, retaliation, reprisal, and problematic under professional conduct rules.

138.   LEE next misrepresented that the IT unit's chief of staff "fired" Plaintiff as justification
       to give all the labor and employment law and Ethics work to the young age 20s male
       attorney.

139.   It was now complete, the Agency, directly by its supervising attorneys:

a.     Hired early age 20s male without disabilities but with no experience or training,

b.     To replace a then-58 female with disabilities, but over 26 years legal practice primarily in
       labor and employment and litigation, and 23 years as an Army JAG with knowledge of
       the regulations, policies, traditions, structure of the Agency, and a prior career teaching.

140.   The IT unit's chief of staff had no authority to direct Plaintiff's employment or
       assignments, and he and other senior IT managers had recently written laudatory
       messages about her work.

141.   For about the next three weeks, LEE arbitrarily irregularly rapidly reassigned random IT
       unit cases back and forth between Plaintiff and the young male attorney, multiple times a
       day and week. LEE left most of the cases with the male so he could track the statuses.
       Plaintiff had only erratically "churned" cases, most times none at all, so she could not
       effectively keep track of the statuses. LEE had never done this before.

142.   Then LEE directed Plaintiff on short notice to write a status report on all the IT cases,
       including what the male had. LEE refused to have the male report on his own work. The
       report was not an Agency requirement, the deadline was arbitrary, LEE gave no template,
       no specific requirements. Plaintiff lost time begging LEE to clarify what information she
       wanted. It took times to review the files. LEE waited until hours before her deadline to
       give any reasonable directions. Plaintiff quickly produced a compliant report overnight,
       but two hours past LEE's deadline.

143.  LEE otherwise was not strict on ad hoc internal work deadlines. This time, when Plaintiff submitted the report, LEE gave her a pre-prepared lengthy reprimand, showing that this assignment was intended to cause Plaintiff to "fail" which could fabricate justification for discipline for removal.

144.  Three times in March and April 2016, Federal Health Service at 26 Federal Plaza examined Plaintiff with cardiac stress symptoms at work and sent her from work to the emergency room via ambulance. Each time, Plaintiff then had several days of medically-ordered leave. Each time, Plaintiff reported the event and her increased cardiology medical care with documentation to LEE.

145.  March and April 2016, Plaintiff repeatedly asked LEE for reasonable accommodation. LEE did not engage about reasonable accommodation.

146.  Early March 2016, after the first hospitalization for the stress symptoms, Plaintiff filed a Federal Workers' Compensation stress claim and gave a copy to LEE the same day.

147.  LEE submitted the response for the Agency to the Department of Labor, under penalty of perjury, denying knowledge of any illness or injury or treatment of Plaintiff, which is easily proven perjurious. Plaintiff reminded LEE in writing of the medical information and proof given to her since her heart surgery in 2013, told her to amend her false statement and comply with USDOL regulations, and that Workers' Compensation can provide reasonable accommodation. LEE had knowledge that Plaintiff was ill and becoming more ill. LEE stood on her perjury resulting in denial of Workers' Compensation and that avenue for reasonable accommodation. It is disability discrimination, denial of reasonable accommodation, harassment, retaliation/reprisal.

148.  Mid March 2016, Plaintiff went on a few days of military duty. In her absence, LEE gave

her coworkers a workplace violence course, for the first time. It is not required Agency training. No one told Plaintiff about it. LEE later told Plaintiff she, alone, did not have to take it. The young male labor and employment attorney later told Plaintiff that while Plaintiff was on military duty, LEE also got each coworkers alone and asked if they could say they fear violence from Plaintiff. The male attorney said he told LEE "Absolutely not, that's ridiculous." That was a Federal supervisor, GS15, suborning false statements in Federal service from her subordinates to make a heinous false accusation against a Federal attorney and senior military legal officer. It is severe and pervasive harassment and retaliation/reprisal. It is a USERRA violation.

149.   Before and while on that mid March 2016 military duty, Plaintiff informed Federal law enforcement agents of what she believed to be evidence of the criminal conduct by USACE officials and attorneys LEE and MCANDREW which she had tried to report to the Agency and been reprised against for. Upon Plaintiff's report and other law enforcement interests, DOJ's Public Integrity unit authorized investigation of LEE and MCANDREW as subjects, regarding their conduct as Agency attorneys committing Federal offenses to further and conceal Federal offenses committed by other Agency attorneys and officials. As Plaintiff reported, it included principally falsifying Government records and false statements to conceal "revolving door," solicitation, endorsement violations by the most senior officer with a contractor having contracts he administered, ongoing contracting irregularities involving substantial sums, and the attorneys and a senior officer (COL MICHAEL CLANCY) colluding to destroy evidence of one of CAPOWSKI's violent attacks on Plaintiff which they and the other of the "four" were close eyewitnesses to and allowed.

150. When the agents were authorized, Deputy Chief Counsel TURNER in USACE Headquarters said she is "concerned about [Plaintiff's] health," and that removal of her duties and extended Administrative Leave are being "offered" as "reasonable accommodation." Plaintiff told TURNER that is prohibited by OPM and it is not reasonable accommodation to stop the employee from working, it is unlawful disability discrimination. Plaintiff requested reasonable accommodation to work. TURNER did not engage on that and instead announced an investigation targeting Plaintiff.

151. Pursuant to Army Regulation 15-6, TURNER appointed an Investigating Officer ("IO") SUZANNE MITCHEM and Legal Advisor JOSEPH FALVEY.

152. TURNER and her investigating officials told Plaintiff and her lawyer that the subject of the investigation was Plaintiff's complaints. As of that time, Plaintiff had made complaints about the subjects of the instant complaint: wrongdoing and crimes by LEE, MCANDREW, et al, and about the harassment, retaliation/reprisal, hostile environment, discrimination, denials of reasonable accommodation, USERRA violations.

153. The IO denied that Plaintiff was a "subject." AR 15-6 affords subjects greater procedural protections and participation rights.

154. It is the practice under AR 15-6 for the IO to liberally provide subjects and witnesses a copy of her appointment memorandum setting forth her authorized scope, the subject(s), conduct of the investigation (sworn statements, etc.). This IO denied Plaintiff and her lawyer a copy and after much argument flashed it before their eyes for perhaps a minute, not long enough to read all or make detailed notes.

155. TURNER appointed investigating officials with prohibited conflicted relationships with LEE and MCANDREW. All are Corps of Engineers supervising attorneys who train and

plan together. The IO had just transferred a young age 20s attorney to LEE's staff. The purported subject of this investigation was Plaintiff's complaints, which were about LEE, MCANDREW (and Command officers and 'C/L/D/F'), so that LEE and MCANDREW should have been subjects, at least material witnesses. It was a conflict for them to be taking any action on behalf of the investigation, especially against Plaintiff, but they did. They pursued Plaintiff at work and home with "orders" that she speak without regard to privilege, Constitutional rights, and confidentiality needs of law enforcement she was cooperating with. LEE and MCANDREW physically bullied and threatened Plaintiff in the Federal building. They were very clear that they wanted to get whatever the agents had before the law enforcement investigation of them got underway.

156.   The IO flashed her appointment memorandum which was crucial to Plaintiff knowing her rights in the process, in exchange for Plaintiff identifying the agents. It was coercion. The IO misled Plaintiff and her lawyer about what she would do after obtaining the agent's identities. Within a couple of hours, with Chief Counsel's office where TURNER is, the Agency induced DOJ to cede investigatory jurisdiction regarding LEE and MCANDREW by misrepresenting that they were investigating and previously had investigated "everything" Plaintiff ever reported. Those are provably false statements. Apart from some questions to Plaintiff in June 2016 which she heard nothing more about, there was no indication of any bona fide investigation by the Agency of anything Plaintiff ever complained about, definitely not about what DOJ was to investigate.

157.   In about May or June 2016, a woman presenting as a Federal officer called at least one of Plaintiff's law licensing authorities inquiring about Plaintiff's conduct and misleading that Plaintiff was in trouble with the Government. There was no OPM authorization for

any background investigation of Plaintiff since her initial hire. As to the military, Plaintiff continuously held a military Secret clearance since approximately 1993.

158.   June 2016, the IO served written examination on Plaintiff seeking "dirt" on her personally, like a background investigation, including her law license history, attempting to falsely imply she lied on her application and background for Federal hire. This investigation had to access Plaintiff's protected information and spoken to others about to formulate these questions, in an investigation that was purported to be about her complaints about others, not her background and conduct, not her as a subject. This shows that TURNER and her investigating officers, LEE and MCANDREW made false and misleading statements to Plaintiff and her lawyer that she was not a subject, when she was, and that they knowingly denied and obstructed her rights and procedural protections to force her to produce the information they needed to obstruct a Federal law enforcement investigation of LEE and MCANDREW.

159.   TURNER and her subordinates lacked authority to investigate Plaintiff's background, exposed Plaintiff as a whistleblower and law enforcement informant, defamed her, and forced her to incur substantial fees and costs for legal counsel.

160.   Clear of DOJ, LEE and MCANDREW became threatening and violent to Plaintiff. They continued to demand the information Plaintiff reported about them. April and May 1, 2016, LEE and MCANDREW who are much larger than Plaintiff physically attacked Plaintiff in the New York office. They physically came up on Plaintiff from behind forcing her forward into rooms, locking her in with LEE at the door to prevent exit while MCANDREW advanced on Plaintiff backing her to the wall/furniture and threatening her demanding what she told Federal law enforcement agents about them. They refused to

allow Plaintiff to leave to get medical attention. The first time, Plaintiff escaped only when LEE changed position, and they gave chase and obstructed her passage. The second time, Plaintiff called police. Only Federal Protective Service responded. They spoke to LEE and MCANDREW confidentially, inappropriately friendly with them. They did nothing to investigate or protect Plaintiff except tell LEE to send her home to telework because she did not feel safe.

161.   LEE complied with the police and gave Plaintiff home telework for the first time.

162.   As a result of all the foregoing hostile environment, Plaintiff had to undergo an invasive cardiac procedure on May 6, 2016, then was diagnosed in the hospital as suicidal, the first time in her life, with depression, anxiety, PTSD, and Bipolar I disorder also a first diagnosis, and hospitalized May 6-19, 2016.

163.   After the May 2016 hospitalization and with knowledge of the new diagnoses, LEE did not offer FMLA leave to Plaintiff.

164.   The Agency used Plaintiff's reasonable accommodation requests to harass her and fabricate justification to remove her. First the Agency delayed and exhausted the fee retainer for Plaintiff's counsel leaving Plaintiff unrepresented. Plaintiff requested only temporary home telework. The Agency already had substantial medical information and Plaintiff gave more. The Agency demanded more medical information than necessary under ADAAA regulations, and formal Agency forms which is prohibited. When Plaintiff complied, the Agency refused the request, then granted it, then threatened to revoke it, then claimed it was revoked and that Plaintiff was unexcused absence but kept Plaintiff on the home telework. The Agency then misrepresented to MSPB in the appeal of Plaintiff's removal that she was unexcused absence when she was teleworking with

documentation.

165. After initially refusing any telework, the Agency confined Plaintiff to home telework with no way back to an office, while maintaining that her work can only be competently performed in the office, and home telework is not reasonable because she is incompetent on it.

SUSPENSION, HARASSMENT, RETALIATION/REPRISAL

166. Plaintiff's son and attorney kept LEE and the Agency's Investigating Officer apprised of the May 2016 hospitalization and discharge date.

167. At discharge, Plaintiff was able to check email. There was new mail from USACE Deputy Chief Counsel MURRAY who was Deciding Official on the suspension. His email was perfectly timed to be the first thing Plaintiff saw upon discharge from two weeks hospitalization as suicidal from her hostile workplace. It was MURRAY's "decision" upholding the suspension taking a week of her pay. MURRAY would have gotten Plaintiff's personal email address from LEE. Having the discharge date, a call to the hospital could get the daily time. It was severe intentional harassment, retaliation/reprisal, and disability discrimination.

168. Plaintiff had no Due Process for the suspension. LEE and MCANDREW provided the Due Process notices and proposal as hardcopies in the office when Plaintiff was on extended sick leave and also unable to access Government email. They had no problem sending the decision and imposition of the suspension directly to Plaintiff's personal email even without authorization. Without justification, MURRAY flatly refused Plaintiff's request for Due Process especially with her sick leave, hospitalization and mental state during the action.

169.   LEE imposed the suspension with only a couple of business days notice despite
        Plaintiff's pleas of medical expenses for herself and her disabled Army Veteran son.

170.   June 1, 2016 Plaintiff began three weeks of military duty. The first duty day, without
        notifying Plaintiff, LEE and MCANDREW and the USACE Headquarters EEO Officer
        NEWTON contacted Plaintiffs' reserve military commander and demanded he remove
        her from military duty. They told her commander that Plaintiff had to complete "urgent"
        work, which is not the truth, they wanted her for TURNER's "investigation." NEWTON
        told the commander he had to question Plaintiff on an EEO complaint about her.
        NEWTON is not an EEO investigator, he was serving as counselor to CAPOWSKI
        makin a complaint about Plaintiff, as CAPOWSKI who was retiring, they wanted to file it
        fast as her last harassment of Plaintiff. Plaintiff's commander refused to remove her from
        military duty. LEE and MCANDREW then "ordered" Plaintiff off military duty, which
        Plaintiff refused under USERRA.

171.   By July 2016, Plaintiff had been out of work on sick leave, military duty, and suspension
        most days since March 2016. She teleworked less than a week. LEE refused to engage on
        reasonable accommodation, demanded unaccommodated return to the office, and the
        Agency assigned NEWTON and SERRANO to Plaintiff's reasonable accommodation
        requests, both under serious conflict. The Agency treated it as litigation. The Agency
        refused to have an interactive discussion. They demanded excessive medical proof. They
        refused even temporary home telework but offered nothing else except use of irrelevant
        City resources.

172.   Plaintiff was able to perform her duties, especially the IT unit work, by home telework or
        alternate work site. She was performing legal work for the Army in the Fort Hamilton

Legal Office supervised by Army civilian attorneys, across the street from MCANDREW who could come over any time and occasionally had business there. Throughout the reasonable accommodation and removal processes, Ft Hamilton's attorneys offered to LEE and MCANDREW office space for Plaintiff at no-cost, with no response until LEE refused it on the eve of removing Plaintiff avoiding an interactive discussion.

173.   Plaintiff's medical conditions are all listed per se disabilities in the regulations to the Americans With Disabilities Act (as amended) entitled to reasonable accommodation. Escalating the harassment, the Agency demanded more medical documentation than permitted by current law.

174.   Plaintiff made requests to LEE and SORRANO to use the "JAN" consultants to assist finding reasonable accommodation. Plaintiff had JAN send materials to them. Both LEE and SERRANO contacted Plaintiff making out that the materials were accidentally delivered to them and they are sending them to Plaintiff. The JAN is the gold standard for assistance to agencies to find reasonable accommodation. The Agency never provided Plaintiff or any other employee at least in New York the JAN's assistance.

175.   The Agency's refusal to engage in the required interactive process forced Plaintiff to expend fees and costs for a second lawyer to seek reasonable accommodation.

176.   The Agency allowed Plaintiff home telework in July and August 2016 but LEE continued to deny it was for reasonable accommodation, and said she could end it any time, for any reason, without regard to disability.

177.   August 2016, LEE directed Plaintiff to violate her medical orders for temporary home telework and return to the office immediately or face discipline or adverse action including removal. The orders for temporary home telework were because of the new

medications Plaintiff was on with summer subway heat and walking, and the need to reduce stress which LEE refused to assist with. It cost Plaintiff attorney's fees seeking an explanation from the Agency of whether the reasonable accommodation was revoked. Plaintiff told LEE she could not violate medical orders and the Agency cannot revoke accommodation the way she did, and requested leave if it was revoked.

178. Then the Agency allowed Plaintiff to return to home telework, but it was no longer temporary with the opportunity to work in the office. The medical orders through early Fall 2016 were for temporary home telework, but the Agency now kept Plaintiff there permanently until she was removed in April 2017.

179. The Agency refused offers from the Fort Hamilton base legal office for Plaintiff to work across the street from MCANDREW's office, walking distance from Plaintiff's home, a place that would likely not require other accommodation.

180. The Agency left Plaintiff home because return to the office and full capability would have undermined the planned removal of Plaintiff as permanently "medically unable to perform."

181. The Agency asserted that Plaintiff was incapable of performing on home telework, but kept her on home telework with insufficient communication, work resources and training.

182. The Agency took zero action to rehabilitate Plaintiff while documenting every alleged failure of this 28 year lawyer and 25 years senior military lawyer.

183. LEE used the home telework to escalate the harassment to degrade Plaintiff's performance. LEE was able to electronically harass Plaintiff silently, undetected all day, and limit Plaintiff's access to workplace information and communications. LEE directed Plaintiff's work to the hour and minute, demanding greater accountability than from any

other subordinate, outside of Agency and OPM time, conduct, telework rules and policies. LEE forced Plaintiff to expend accountable work time defending against baseless but very serious accusations, such as refusing to do work, professional incompetence, time theft, falsifying training records. LEE threatened to dock pay and get Plaintiff criminally charged. LEE forced Plaintiff to be looking at the computer screen every second to comply with LEE's directive for immediate response to anything from her. None of that is done in the office.

184.    Plaintiff suffered severe stress from the severe and pervasive harassment and retaliation/reprisal and discrimination against her. In 2012 and 2013, Plaintiff informed LEE that the hostile workplace was exacerbating her cardiac arrythmias and she was under medical care and needed reasonable accommodation. LEE did not engage on reasonable accommodation. In Spring 2013, Plaintiff got a dangerous form of atrial fibulation. Heart surgery (ablation) was recommended, with several days hospitalization, months of multiple difficult medications, and a one-year recovery period. Plaintiff commuted by mass transit which would be difficult and dangerous for a time after surgery. Plaintiff had limited accrued leave due to only three years of GS employment and having been forced to use to it for military duty because LEE had not assisted to get the Agency to give her the paid military leave benefit.

185.    LEE did not engage about reasonable accommodation. Plaintiff asked LEE to return to work post-surgery on temporary home telework as reasonable accommodation. LEE flatly refused with no alternatives, no mention of FMLA leave.

186.    The denial of reasonable accommodation forced Plaintiff to return to the office too early and she suffered a recovery relapse with a permanent complication of diaphragm

paralysis requiring extension of medications. LEE still did nothing to engage on reasonable accommodation.

187. A few months after denying any accommodation whatsoever or FMLA for Plaintiff's heart surgery, LEE approved liberal home telework for several weeks for an age 20s attorney to afford her postpartum time at home without using accrued leave, in violation of the Telework Enhancement Act and OPM telework policy. Plaintiff complained to LEE about it being disparate treatment in reasonable accommodation based on age and type of disability and likely unlawful. LEE's response was to offer Plaintiff a couple of days of home telework, now that Plaintiff no longer needed it, in return for Plaintiff's silence about what LEE was giving the younger employee. Still post-surgery, Plaintiff could commute, but not carrying the heavy Agency computer home through steep subway stairs and long street walks, or incur substantial unreimbursed cab expenses for a meaningless two days of telework.

188. LEE and MCANDREW did not inform Plaintiff that LEE had a telework for attorneys, in Plaintiff's assigned labor and employment law and Ethics. It was servicing the Agency's worldwide IT unit, who mostly home teleworked, even the most senior positions. LEE assigned it to her older male labor and employment and Ethics attorney who did wanted to work in the office, but could have done it anywhere.

189. 2015, two years after Plaintiff was denied home telework after heart surgery, LEE and MCANDREW assigned her the worldwide IT unit telework but required Plaintiff to work in the office.

190. By 2015 the harassment was severe and pervasive. Plaintiff suffered increasing physical mental and emotional stress. Plaintiff repeatedly asked LEE for assistance, for access to

programs like the Employee Assistance Program, FMLA, and other reasonable

accommodations. LEE did not engage on reasonable accommodation. Instead, LEE set

about greatly increasing harassment to force Plaintiff to quit, and fabricating justification

to remove her.

191.   2016 the workplace harassment against Plaintiff resulted in three hospitalizations in

March and April and two weeks in-patient treatment in May 2016 and a new diagnosis of

Bipolar Disorder I, PTSD, suicidal depression and anxiety.

192.   March 2016, Plaintiff received her 2014-15 annual evaluation and a bonus from LEE and

MCANDREW. It was issued before Plaintiff complained to Chief Counsel about them.

They rated Plaintiff's 2015 performance excellently and awarded a cash performance

bonus.

193.   May 2016 Plaintiff requested reasonable accommodation of temporary home telework.

The Agency initially objected and forced Plaintiff to expend an attorney retainer just on

the Agency's demands to request reasonable accommodation.

194.   Suddenly in August, LEE allowed Plaintiff home telework but told Plaintiff it was not for

accommodation. Later Plaintiff learned it was to keep her out of the workplace while they

fabricated justification to remove her using her reasonable accommodation.

195.   To remove Plaintiff, in August to October 2016, SERRANO participated in procuring a

letter with the appearance of a medical opinion, but not a medical opinion on Plaintiff's

"fitness for duty" or "work capacity." SERRANO was legal advisor to LEE and other

Agency officials removing Plaintiff. Without Plaintiff's consent or knowledge or express

legal authorization, SERRANO, LEE and unauthorized HR person MELISSA NEWMAN

disclosed Plaintiff's confidential personnel and medical information and records to a

contracted Federal Health and Human Services physician, who received the materials without consent or authorization.

196. NEWMAN was not authorized because it requires specific assignment to have access to confidential information and records and handle any personnel matter outside the assigned workplace and she did not have that at all relevant times. Her two supervisors' positions were vacant leaving no one to make the assignment. The purpose for that rule is protection of the employees from what NEWMAN, SERRANO, LEE, did the Plaintiff,

197. While Plaintiff was on home telework as reasonable accommodation of disabilities, LEE accused Plaintiff of professional incompetence and attempted to degrade Plaintiff's competence, including but not limited to:

   a. Replacing all Plaintiff's officially assigned duties in her practice areas with unfamiliar work she was not trained or currently trained in;

   b. Denying Plaintiff training;

   c. Giving Plaintiff too little work to gain and maintain competency;

   d. Denying Plaintiff clear work directions and feedback;

   e. Denying Plaintiff a Performance Improvement Plan;

   f. Denying Plaintiff sufficient time to learn new practice areas and matters;

   g. Directing Plaintiff to write a litigation memorandum for the case. That is a comprehensive detailed analysis and strategy of the case. It requires thorough access and knowledge of the facts and potential evidence, which LEE deprived Plaintiff of. LEE declared the memorandum incompetent, made demeaning comments about Plaintiff's intelligence and competence, and used the memorandum to support removal of Plaintiff.

198.    LEE did not offer any reasonable accommodation or FMLA leave to Plaintiff after that

         medical event.

199.    Following the May 2016 hospitalization, the Agency abandoned trying to eliminate

         Plaintiff as a "violent threat" or insubordinate, and set about removing Plaintiff as

         "medically incapable of performing."

200.    On June 1, 2016, Plaintiff began three weeks of military duty at Fort Hamilton. LEE and

         MCANDREW and USACE Headquarters EEO Officer NEWTON called Plaintiff's

         military commander and demanded he remove Plaintiff from duty and return her to them

         for "emergency work" which was misleading.

201.    Plaintiff's military commander refused to remove Plaintiff from military duty. He

directed MCANDREW to put her requests in writing.  He complained to Plaintiff about

         MCANDREW harassing him because they called several times and directed Plaintiff to

         make it stop. It was harassment and retaliation/reprisal and a USERRA violation.

REASONABLE ACCOMMODATION 2016-17, REMOVAL

202.    The Agency used reasonable accommodation as a tool for harassment, retaliation/reprisal.

203.    SERRANO was advising LEE on the reasonable accommodation request that NEWTON

         was supposed to be assisting Plaintiff with. They worked together against Plaintiff's

         reasonable accommodation.

204.    NEWTON did nothing to assist Plaintiff with it and instead used CAPOWSKI's

         complaint about her to harass her when he knew the accommodation was requested for

         stress-induced conditions.

205.    SERRANO as alleged elsewhere herein repeatedly requested medical information the

         Agency has no right to. With and without counsel, Plaintiff provided ample

documentation for reasonable accommodation. She was asking only for temporary accommodation.

206.   With SERRANO as legal advisor, LEE denied accommodation of home telework and telework at Fort Hamilton with the false statement that the Agency prohibits telework for all its attorneys for any reason.

207.   In about August to September 2016, without Plaintiff's knowledge or consent, Attorney SERRANO, as LEE's legal advisor, disseminated Plaintiff's medical information and records to a contracted physician in Maryland, soliciting an opinion about Plaintiff's medical condition and work capacity, which as written was done only about mental health.

208.   SERRANO acted without Plaintiff's consent which means she needed authorization in the controlling OPM regulations. There is no truly involuntary examination or opinions on Federal employees. They may only be done by medical examination or consultation with the employee's own medical treators. Neither was done, and they may be done only for Workers' Compensation, initial qualifications and fitness for duty exams for certain occupations, none of which applied to Plaintiff. OPM requires mental health opinions to be done upon examination by a board-certified psychiatrist. They had none.

209.   SERRANO and LEE knew they lacked authority for this. Their knowledge is shown by their assertions that they were authorized for reasonable accommodation. That is wrong, reasonable accommodation is not an authorized reason for an involuntary OPM medical examination and opinion of a Federal employee, nor one that does not comply with any of the OPM requirements. Reasonable accommodation is not even mentioned in OPM regulations because it is under EEOC's authority, in the regulations for the Americans

With Disabilities Act (as amended, ADAAA) which prohibits any employer from obtaining a medical opinion or examination or even medical records involuntarily on account of disability. There is no override on privacy, medical consent requirements because an employee seems to need or requests reasonable accommodation. But that is what the Agency did.

210. Before and after SERRANO obtained the contractor's letter, Plaintiff provided them the OPM and ADAAA authorities on their lack of authority and misuse of the FOH office.

211. When Plaintiff first heard LEE wanted to do something with FOH which LEE refused to reveal, Plaintiff contacted FOH and its Director acknowledged lacking authorization to do anything, said they never override consent and assured they were not proceeding and would destroy the copies of her medical records they had.

212. LEE and SERRANO had already disclosed Plaintiff's medical information without even informing her.

213. Unknown to Plaintiff, SERRANO and LEE then proceeded with the contractor despite what FOH said.

214. Someone acted fraudulently to do the foregoing scheme with the contractor.

215. SERRANO and LEE offered as support for Plaintiff's removal a letter obtained from the contracted physician. It cannot be presented as a medical opinion because of the lack of consent, lack of examination or consultation with Plaintiff's treators, and that physician is not a board-certified psychiatrist.

216. Even if the Agency could validly assert the contract physician's letter, it fails to state what is necessary for a finding of medical inability to perform.

217. SERRANO and LEE deprived Plaintiff of the protections for her privacy for medical

information and medical opinions about her by the Government, and employment security given by Congress, and OPM and EEOC regulations. SERRANO and LEE do not enjoy immunity as lawyers for that.

218.  SERRANO advised LEE to use this tainted activity and information from the contractor to remove Plaintiff.

219.  SERRANO as Agency representative misrepresented it to MSPB as legitimate Agency action.

220.  At no time did SERRANO make a correction or withdrawal of anything not fully lawful and ethical.

221.  Throughout her employment with USACE, Plaintiff was able to perform all her essential job functions with or without reasonable accommodation for her disabilities.

222.  At all times relevant herein, Plaintiff required and requires only reasonable accommodations which may not be required permanently.

223.  From July 2016 to April 15, 2017, LEE kept Plaintiff working full-time by home telework, but used it to harass Plaintiff daily, including but not limited to accountability requirements above and beyond what is required of other employees; hyper-scrutiny of her checking in and out of work, having to report out for lunch, bathroom and loss of internet connection lasting for decreasing lengths of time; hyper-scrutiny of her work on telework, and directions Plaintiff to meet in the office while making that not feasible.

224.  LEE had knowledge of the legal and policy requirements of telework including as reasonable accommodation because she had Plaintiff prepare a presentation on it for LEE to give to other supervisory attorneys and MCANDREW circa 2014.

225.  Plaintiff was the sole experienced trained Federal litigator in New York District. August-

September 2016 LEE stopped assigning litigation to Plaintiff. LEE assigned one new

case to another attorney and misled Plaintiff to believe that she had the case in main. LEE

repeatedly directed Plaintiff to make the engineering team involved in the case meet with

her face-to-face in the office at 26 Federal Plaza. The only reason for that was to remove

Plaintiff's reasonable accommodation.

226.   Plaintiff has handled most of the litigation with that team and DOJ. LEE pushed them to

have a face-to-face meeting. They team leader was annoyed and refused and did their

customary phone meeting. Plaintiff attended on home telework. The call was brief,

Plaintiff had no information and they already handled their information with the other

attorney. The team leader was annoyed at this waste of time and said no more meetings

with only Plaintiff while they were already working with another attorney. LEE's scheme

to force Plaintiff off reasonable accommodation harmed an important work relationship.

227.   LEE then directed Plaintiff to write a litigation memorandum for the case. That requires

thorough review of the pleadings, evidence and discussion with some of the witnesses.

LEE left Plaintiff on home telework and limited Plaintiff's access to what she needed for

the memorandum. The other attorney had the file and did not share. LEE refused

Plaintiff's requests that she direct the assigned attorney to include Plaintiff in meetings

and share. LEE's whole staff almost completely avoided Plaintiff. When Plaintiff

requested information, LEE demeaned her personally attacking her intelligence and

professional competence. LEE declared the memorandum incompetent and displayed it

as incompetent to the engineering team leader to further erode her trust in Plaintiff.

228.   Plaintiff has been a trial lawyer for almost three decades with over 20 years of all types of

civil litigation and hearings in private practice and at the time of her removal, 24 years in

the Agency's JAG Corps. Plaintiff's prior Federal litigation successes in USACE all involved high dollars and unusual subjects, including but not limited to recovery and production for EPA counsel and DOJ of documentation from cleanup at Sidney, New York supporting the largest ever enforcement recovery settlement by the United States of $5.15 billion dollars (Tronox); settlement at full demand of several million dollars before trial from a foreign shipping company in an unusual affirmative tort claim by the United States; complete dismissal of a contractor's Bivens action; and unconditional withdrawal of a Florida beach erosion suit with hundreds of millions of dollars at stake and shoreline management implications for the whole East Coast and USACE operations. In each case, Plaintiff had full responsibility, with no support personnel provided by LEE, for Agency documents, witnesses, discovery coordination, and direct coordination with DOJ, sister agencies, investigators, experts. Mr. MURRAY who was the Deciding Official on the suspension where he denied Plaintiff any Due Process, denied her reasonable accommodation for her to have Due Process and instead harassed her in her hospitalization, was also Deciding Official for the removal. He was required to recuse because he approved LEE's discipline a short time before the removal proposal, and the discipline had to be walled off even as to credibility because the removal was solely for medical inability. He refused to recuse himself and upheld the removal.

229.  At all times, the Agency refused to engage in the interactive process for reasonable accommodation of all Plaintiff's qualifying disabilities.

230.  In November 2016, LEE denied Plaintiff home telework preliminary to proposing removal but kept Plaintiff on home telework until removal misusing it to isolate Plaintiff, cut her off from information and records, harass her all through the day, then accuse her

of incompetence.

231.  Plaintiff requested permanent home telework. Plaintiff was capable of working in an ordinary reasonable safe professional office with many coworkers and clients, like the Fort Hamilton Legal Office.

232.  Plaintiff made repeated requests to LEE to return to the New York District office or another office like Fort Hamilton. LEE did not engage in an interactive process and instead trapped Plaintiff on home telework creating a false impression that Plaintiff refused anything else or was incapable of working anywhere else,

233.  For return to the office, Plaintiff proposed as accommodations things all employers are required to do for all employees: stop the harassment, retaliation, reprisal, discrimination, hostile workplace. Plaintiff proposed a safety plan for her to work in the Manhattan office, for example, reasonable limits on behavior like no physical bullying, no locking Plaintiff in rooms, allow her to use the health office. Plaintiff proposed working in another area of the three large floors of the Agency's Manhattan office, or in the Agency's regional office on Fort Hamilton, or steps away in the Fort Hamilton Garrison legal office where she did her military attorney service, which offered her space without cost. LEE refused everything.

234.  Plaintiff wrote to the Agency's Safety and Security officers requesting a discussion about whether a safety plan could be devised. Advising them under conflict, LEE made them refuse communication with Plaintiff.

235.  The Agency initiated removal of Plaintiff only four months after Plaintiff was diagnosed and began treatment. Plaintiff's request and medical orders for temporary home telework were expressly for stabilization and adjustment to new treatment. The removal was

completed only 11 months after diagnosis and commencement of treatment.

236. The Agency removed Plaintiff without sufficient evidence that Plaintiff was medically incapable of performing anything, with or without reasonable accommodation, for any period of time, certainly not permanently.

237. The Agency does not have sufficient medical data on Plaintiff to support permanent inability to perform. Plaintiff gave the Agency leave notes and pursuant to the ADAAA amendments only the medical information and records required for her July-August 2016 request for temporary reasonable accommodation or recovery post-hospitalization. Plaintiff could not know the exact length she would need accommodation for stress and psychiatric conditions, but the Agency shut the door and made its case for removal based on the early information when Plaintiff was newly diagnosed on new medications and the most impaired. The removal was nine months later. Plaintiff's conditions, treatments, needs changed. The Agency did not seek anything from Plaintiff to update because they already decided to remove her, from Chief Counsel's office down.

238. 2016-17, LEE, SERRANO and MURRAY under the authority of Chief Counsel COOPER put forth as the Agency's position that Plaintiff is medically incapable of performing her GS attorney duties with or without reasonable accommodation, and based on their articulation of that position, they caused Plaintiff to be removed from the GS effective April 15, 2017.

239. Until June 26, 2018, this same Agency retained Plaintiff in military service performing attorney duties without reasonable accommodation until her maximum service age of 60, then granted Plaintiff an Honorable Discharge and nonmedical military retirement. Plaintiff is now a Veteran.

240. LEE, SERRANO, TURNER, MURRAY and others had knowledge of Plaintiff performing legal work as her military duty at Fort Hamilton and still removed her GS attorney duties and removed her from her GS attorney position asserting she is medically incapable of performing GS13 General Attorney duties for this same Agency.

241. At all times relevant herein, Plaintiff's regular daily duties in her military and civilian jobs with the same Agency were substantially the same.

242. At all times relevant herein, GS civilian attorneys and JAG Officers in the Army practice under the same professional rules, laws, regulations, and legal training from the Army.

243. Military service has higher medical fitness requirements than Plaintiff's civilian position, which had none. In her military service, Plaintiff was subject to at least periodic medical examinations and required to self-report medical status changes which she complied with. There were no such requirements for her GS position.

244. By law, there is no reasonable accommodation for Servicemembers

POST-REMOVAL HARASSMENT, RETALIATION/REPRISAL

245. Following her removal, by law and OPM regulations, Plaintiff was entitled to severance pay. It is directory not discretionary for involuntary "no fault" removals including medical inability.

246. The HR person who processes removal is responsible for coding the SF50 for severance and using HR's data on service years and age to calculate the sum.

247. The HR person who processed the removal NEWMAN worked closely with SERRANO and LEE, and falsely coded the SF50 for no entitlement to severance without due cause therefor.

248. Plaintiff had to complain for months to the Agency's highest HR command ("Army G1")

who inquired and directed the Agency's regional HR chief DEMARAIS to process the severance pay. It took that person several months and multiple directives from his top command to act. It took sending another supervisor to the staff to get it done. There was nothing unusual about Plaintiff's severance, it was minimal amount due to her low years of service. It was harassment.

249. Indicia that the refusal to process the severance was intentional harassment, retaliation/reprisal are that the Army G1 official who determined the severance was due has documented that when she tried to inquire, Ms. NEWMAN refused to cooperate, evaded and misled. NEWMAN did the same under oath in the MSPB hearing.

250. Agency's regional HR chief DEMARAIS was personally aware of Plaintiff's severance. Plaintiff complained directly to him and his deputy, and his highest HR commander Army G1 directed him to correct it. In response, he took several months and multiple directions before the severance was ordered.

251. NEWMAN appeared as the Agency's witness in Plaintiff's MSPB appeal hearing and gave at the least misleading testimony about how she, SERRANO and LEE created the basis for the removal, reason for denying reasonable accommodation, and her dishonesty with the G1 inquiry, denying knowledge of Plaintiff's severance when her name is on the SF50 denying severance. HR's conduct with the severance and misrepresentations about it is harassment, retaliation/reprisal.

AGENCY EEO COMPLAINT INVESTIGATION

252. The Agency did not provide Plaintiff a fair and meaningful EEO complaint process.

253. Plaintiff had no EEO assistance in New York. Early February 2016 Plaintiff contacted Headquarters EEO then HECSA asking to file a complaint. They did not assign a

counselor until May 2016 after several requests. They assigned one who could not assist

Plaintiff to investigate and assemble a complaint long distance because he was a

contracted counselor teleworking at home in Maryland without Government email,

equipment, access to Government computers to obtain electronic files and secure

anything. He could not get Plaintiff's numerous evidence, medical documents unless she

printed these thousands of page and postal mailed it but he has no way to ensure security.

The Agency refused to provide him what was needed or get another counselor. Plaintiff

did not get the required counseling assistance and her facts and evidence were not put in

the complaint file.

254.    In about May, the Agency assigned Headquarters EEO Officer NEWTON to "assist"

Plaintiff's request for reasonable accommodation, and HECSA labor and employment

counsel LEAH SERRANO to advise the Agency on it. Simultaneously, NEWTON

undertook assisting a major subject of Plaintiff's complaint – his long-time subordinate

CAPOWSKI - to make an EEO complaint about Plaintiff, and SERRANO was labor and

employment counsel to the HECSA EEO who were assigned to assist Plaintiff's EEO

complaint. NEWTON and SERRANO were each conflicted on EEO the matters

involving Plaintiff.

255.    Plaintiff's EEO complaint did not advance for almost four months since first contacting

EEO. The Agency, by NEWTON, moved on CAPOWSKI's complaint in a day. On June

1, 2016, without notifying Plaintiff, NEWTON contacted Plaintiff's military commander

demanding her removal from military duty for his interrogation of her for the

CAPOWSKI complaint.

256.    Plaintiff's complaint languished for seven months before the Agency filed a complaint

for her. Plaintiff had to pay a lawyer and write her own complaint. Her lawyer gave the Agency's EEO a complete legally reviewed complaint to file. Without Plaintiff's knowledge and consent, the Agency, by EEO Officer HARRIS substituted its own inadequate incomplete complaint for Plaintiff's and refused to correct that. That was the second opportunity to have her facts and evidence in the complaint file denied to Plaintiff.

257. HARRIS used an expired mail address for Plaintiff that the Agency knew was not good. He refused Plaintiff's requests through 2017 to forward her correct address to wherever the Agency sent her complaint or correct the electronic record.

258. In October 2016 LEE and whoever was working with her to remove Plaintiff burdened Plaintiff with time-consuming responses to two baseless EEO complaints about Plaintiff instigated by CAPOWSKI, one being her own complaint.

259. Attorney LEAH SERRANO in HECSA had multiple conflicted roles and unauthorized activities that deprived Plaintiff of a fair EEO complaint process counseling and investigation:

   a. SERRANO advised NEWTON in his purported assisting of Plaintiff's reasonable accommodation requests while she was Agency counsel working to deny that reasonable accommodation. SERRANO used the purported reasonable accommodation evaluation process with NEWTON to get evidence for her client (the Agency) to use to remove Plaintiff;

   b. Plaintiff did not request anyone to help her apply for accommodation and NEWTON refused her demand that he step aside. SERRANO as Agency counsel was advising the Agency on what NEWTON did, for example, telling Plaintiff's military

commander to curtail her duty to harass her with CAPOWSKI's complaint;

c.    In representing the Agency in the appeal of the removal, SERRANO had to defend her

own conduct, to wit, Plaintiff's EEO affirmative defenses in appeal of the removal,

failure to accommodate and disability discrimination as to 2016 conduct, are in

substantial part about SERRANO's conduct as alleged elsewhere herein. Plaintiff warned

SERRANO of violating EEOC Management Directive 110 and similar conflicts rules.

SERRANO refused Plaintiff's requests that she resolve the conflicts or recuse herself.

260.    The Agency did not provide Plaintiff reasonable accommodation for the complaint

investigation process.

261.    Before, after and during the EEO "investigation," all management involved, SERRANO,

and the EEO people had knowledge that Plaintiff was on home telework as reasonable

accommodation for disabilities.

262.    No one consulted Plaintiff in arranging an atypical investigation by a hearing, at the

Agency instead of a neutral location, in a case where Agency management officers and

attorneys made outrageous accusations that the complainant is going to shoot people at

work.

263.    Hearings as an alternative EEO investigation tool are rare. USACE supervisory attorneys

have been requesting them to bully their subordinate attorneys who complain. To avoid

unnecessary stress, Plaintiff requested the standard process as reasonable

accommodation, wherein the investigator does a telephone interview, can ask follow-up

questions, then drafts a declaration summarizing for the witnesses' signature, and obtains

evidence especially from complainant.

264.    The investigator identified himself as an attorney and was hostile. Plaintiff had to

complain to his superiors to get any reasonable accommodation. By then he was not impartial but refused to recuse himself.

265.    The investigator agreed to a written declaration but refused to interview Plaintiff. With no prior notice, he served Plaintiff at least 2,500 form questions for written answers with an impossible deadline of a few days. The standard interview and declaration would be a fraction of these questions because it is tailored. This investigator made so many questions by giving separate questionnaires for each subject.

266.    Meanwhile the Agency was starting to serve parts of the removal on Plaintiff requiring full attention and responses. LEE did not have to do it during the EEO investigation. The investigator gave limited more time but it was impossible. Plaintiff told the investigator how she was making progress and he suddenly ended the investigation in about February 2017, for the second time with none of Plaintiff's abundant evidence.

267.    That was the last Plaintiff heard about her EEO complaint. The Agency's EEO officials and New York EEOC have not responded to phone calls, faxes, emails about status, location, copies.

MSPB APPEAL

268.    The removal was upheld.

269.    There were numerous serious irregularities with the MSPB's hearing of Plaintiff's mixed appeal, starting with failure to disclose to Plaintiff that the AJ is or had been legal counsel to the Agency. She is a Commissioned JAG Officer who served on Active Duty. Commissioned Officers may still have affiliation after discharged from Active Duty. She could be in the reserve, even if inactive on call-up rolls only there is still a duty requirement. Some retirees can go back on duty. Regardless, she has continuing attorney-

client duties. This is a substantial likelihood of actual impartiality and at least the appearance thereof requiring recusal. MSPB could easily have assign another AJ.

270.  Supporting a reasonable finding of actual impartiality of the AJ includes:

a.  The AJ's dismissal of all Plaintiff's affirmative defenses (disability, age, sex discrimination, harassment, retaliation, whistleblower reprisal, hostile work environment) for lack of jurisdiction for failure to plead with specificity, save retention of affirmative defense of failure to provide reasonable because Plaintiff answered a few questions the AJ posed about that, and only that. The AJ gave no directions of a requirement to plead with any specificity because there is no pleading whatsoever in these MSPB appeals, the affirmative defenses are commonly just listed. Plaintiff had an experienced MSPB attorney draft and file the affirmative defenses. When she gave the questions about reasonable accommodation, the AJ set a deadline to give her that information and if Plaintiff wanted to plead something she could. The AJ then limited the affirmative defense of reasonable accommodation to what was given in response to her limited questions now treating it as a pleading, which was not Plaintiff's understanding. When the AJ then disposed of all the other affirmative defenses for failure to plead them, Plaintiff said she did plead them in the usual manner. The AJ rejected that faulted Plaintiff for not pleading enough. That is some kind of specificity requirement that MSPB does not require;

b.  With less than complete clarity to Plaintiff, the AJ excluded every one of Plaintiff's witnesses, no reason provided. Plaintiff had provided a detailed proffer for each, requesting only a few with no repetition. Only the Agency was allowed witnesses. It was a Due Process violation and no cure was provided;

c.  The AJ excluded almost all Plaintiff's evidence because part was e-filed after the AJ's deadline. It was a large volume and took a lot of time just to prepare the file, because the AJ and MSPB have marking requirements, and there is a  small file size limit making for more marking for parts of split files. Plaintiff had never before efiled anything over a few pages in MSPB. The system is old slow technology, difficult with large volumes like hearing evidence. MSPB's stated policy is that efiling interruptions especially with pro se "tolls" deadlines so long as the filing was commenced prior to the deadline, it can be completed after, or hand-filed the next day or two. The AJs are required to offered this to pro se appellants. This AJ did not for Plaintiff. Plaintiff began efiling before the deadline on a Friday, got some in, ran into problems, contacted MSPB IT and Clerk and followed their directions to keep filing and tell the AJ Monday. Before Monday, the AJ personally went in the system and removed Plaintiff's filings. That took the timestamps from Plaintiff's access. The AJ accused Plaintiff of lying about when she started filing. Plaintiff did not and requested documentation from MSPB IT. They produced a record consistent with what Plaintiff had reported to the AJ. They were looking for more when the AJ directed them not to give anything to Plaintiff. The AJ continued to exclude Plaintiff's evidence as filed untimely. At some point the AJ restored one of Plaintiff's files of evidence to the docket;

d.  Close to the hearing, the AJ told Plaintiff she could get her evidence back – not have it admitted - if she met some unstated burden of proof on "what it will prove" by a written proffer on each document, which are maybe a thousand. Grossly inadequate time was given. In employment and EEO cases the evidence usually supports

multiple claims, even with only one affirmative defense, the appeal in main made several issues and many events. This required e-filing all the evidence again for the AJ's review, but because Plaintiff could not get to all her evidence she would have to choose and spend substantial time reassembling, remarking files to efile again, taking time from drafting the proffer. Plaintiff was able to submit something addressing a small fraction of her excluded evidence. There was no context as in a hearing. The Agency with vastly superior resources had no such extra burden before hearing or on its evidence. This evidence proffer offer did not substantially correct the gross Due Process violation;

e. The AJ held the hearing without notice to Plaintiff that she would hold it all day and night to the wee hours of next morning. At the beginning, saying nothing about that, the AJ asked Plaintiff if she needed reasonable accommodation which would be a different chair which is irrelevant to Plaintiff's disabilities which the AJ had knowledge of from the removal documents with medical records already in the record. The AJ may have mentioned rest breaks then she was strict about those. The AJ refused to say when she was ending, saying this is how they do hearings there. Plaintiff had no notice to plan for this, had no assistance with her, felt more and more unwell, was having medication side effects, unable to think clearly enough as it dragged some 15 or 16 hours. In sum Plaintiff had no reasonable accommodation for this Government hearing about the Government having denied her reasonable accommodation. Even if it wasn't an accommodation issue the whole process was irregular.

271. Other issues with the conduct of the hearing and the AJ's decision are within her

transcript and decision, for example, the AJ improperly criticized Plaintiff's "attitude" or treatment of LEE, which was not at issue for the appeal hearing because that was not the basis for removal.

272. The Agency had other suitable positions before removing Plaintiff or knew of others coming open in a reasonable time that the removal could have been delayed, but offered none to Plaintiff.

273. One such suitable position, not the only one, was GS14 attorney position located at Fort Hamilton. Upon information and belief, that vacancy was from the planned retirement of the occupant who previously was a coworker on LEE's staff. Plaintiff timely applied and was rated "Best Qualified" by HR. the Agency's. The position offered as an alternative liberal telework from anywhere. Upon information and belief, Plaintiff was the sole candidate for Fort Hamilton and for telework. Then the Agency refused to advance Plaintiff's application. October 2017 Plaintiff inquired and HR said the vacancy was still pending. A few days later, HR said the vacancy was revoked and Plaintiff would be given no further consideration.

274. The Agency knew that it removed Plaintiff on the proffered basis that she can only work on home telework and that is not reasonable because the Agency's policy is no telework for attorneys. The GS14 position allowed work at Fort Hamilton or by choice telework from anywhere, in any amount. It did not exclude home telework, it said anywhere. The Agency said nothing about that being for reasonable accommodation. Upon information and belief, everyone involved in Plaintiff's reasonable accommodation and removal knew about it. It is unlawful disability discrimination, retaliation/reprisal.

275. Another suitable position opened April 2018, a GS13 General Attorney Term version of

Plaintiff's reserve JAG duty for the Fort Hamilton Legal Office. This position was created in Plaintiff's part because her unique long dedicated JAG service there was ending June 2018. Plaintiff served in that office five years and did the same duties throughout her 25 year JAG service and 20 years private practice before the USACE position. There would not be lawyers retiring from Active Duty with this amount of experience in a practice area because they get rotated. The Hamilton legal office encouraged Plaintiff to apply. The Fort Hamilton Commander gave her his coin and encouraged her to return.

276.   Plaintiff timely applied for the Term GS13 attorney position at Fort Hamilton. She submitted a complete application. The same HR staff at first ignored her application. HR is required to code it only minimally qualified for lawyers meaning has legal education and licensing, which Plaintiff does. Plaintiff complained to regional HR chief PHILIP F. DEMARAIS who failed on the severance. He and his deputy said there is no "best" or higher qualification for attorney hires, everyone is minimally qualified. He could not explain how his staff assessed Plaintiff "best qualified" for the GS14 vacancy. He also demeaned and yelled at Plaintiff that she cannot complain anymore, has not responded to FOIA and Privacy Act requests.

277.   Next HR rated Plaintiff's application "not qualified" at all. OPM requires that even if they assess someone not qualified they are required to immediately tell the person what is missing. They did not. It appears Plaintiff was off the list when she could have neem considered. The next HR letter said Plaintiff was minimally qualified, but too late, the selection was done.

278.   Upon information and belief, only male or nearly all male and non-disabled Active Duty

JAG Officers at the rank of Colonel who are retiring but under age 50 were considered and selected for that Term vacancy in anticipation of a supervisory position coming open.

279. Upon information and belief, Plaintiff's broad and long knowledge, skills and experience are superior to those of any retiring Active Duty JAG Officer.

280. Denying Plaintiff even a chance to compete in favor of non-protected class persons is disability, age and sex discrimination and a prohibited personnel practice.

281. The reasons the Agency gave for non-qualification, non-consideration, non-selection are pretexts for unlawful discrimination on the basis of disability, age, sex, retaliation and/or reprisal.

282. In both the Agency's vacancies at Fort Hamilton Plaintiff requested disability hire consideration and got none. It is unlawful disability discrimination, retaliation/reprisal.

**COUNT ONE, DISABILITY DISCRIMINATION, THE REHABILITATION ACT OF 1973, 29 U.S.C. §§ 701, 501, 504. TITLE I OF THE AMERICANS WITH DISABILITIES ACT OF 1990 ("ADA"), 42 U.S.C. §§ 12101, ET SEQ., AMENDED BY THE ADA AMENDMENTS ACT OF 2008 (P.L. 110-325)**

Paragraphs (1) through (282), inclusive, are incorporated as paragraphs (1) through (282) herein.

283. The Agency subjected Plaintiff to intentional discrimination in the terms, conditions, and privileges of her employment on account of one or more of her disabilities, history of disability or perceived as, in one or more of the following ways:

a. Failing or refusing to provide reasonable accommodation for Plaintiff's disabilities;

b. Failing or refusing to engage in the "interactive process" to find reasonable accommodation for Plaintiff;

c. Subjecting Plaintiff to harassment and investigation by false accusations of incompetence, insubordination, goldbricking, fraud, as pretexts to remove her based on her disabilities, history of disability or perceived as;

d. Selective enforcement of its purported personnel and disciplinary rules and policies or creating rules and policies against Plaintiff on the basis of her disabilities, history of disability or perceived as;

e. Failing or refusing to adequately train its employees in the employment rights of employees with disabilities and the duties of supervisors, managers, EEO officials, Human Resources officials, and attorneys;

f. Failing or refusing to maintain a reasonable and meaningful process for persons with mental/emotional disabilities to make complaints of discrimination and harassment, and investigation and remedy of complaints;

g. Failing or refusing to conduct a meaningful investigation of the harassing and discriminatory conduct toward Plaintiff by its supervisory personnel, EEO and HR personnel, and attorneys;

h. Failing or refusing to take corrective action, including reinstating Plaintiff or hiring her in an equivalent other position, and disciplining and training its personnel.

284. The reasons the Agency gives for its adverse employment actions and harassment against Plaintiff are pretexts for intentional unlawful disability discrimination and animus.

285. As a direct and proximate result of the Agency's unlawful intentional disability discrimination, Plaintiff has suffered:

a. Loss of her employment, benefits, Social Security and retirement contributions and earnings, at an age where she is unlikely to be able to recover;

b. Loss of her pension three years before full vesting;

c. Loss of her legal career stature and reputation and advancement;

d. Loss of her private practice which she left on the promise of stable Government

employment with meaningful civil service protections and Due Process;

e.   Unreimbursed medical expenses;

f.   Severe emotional and mental distress and physical stress requiring substantial

ongoing medical treatment;

g.   Attorney's fees and costs.

## COUNT TWO: FAMILY AND MEDICAL LEAVE ACT OF 1993, 29 U.S.C. §§ 2601, ET SEQ.

Paragraphs (1) through (282), inclusive, are incorporated as paragraphs (1) through (282) herein.

Paragraphs 283 through 285 are skipped to resume at 286.

286.   Defendant was required to make available FMLA benefits and a means of applying to

Plaintiff for medical care of herself and her Veteran son, and did not, causing Plaintiff to

her own accrued leave.

287.   Plaintiff could have used FMLA benefits to better care for her health and a means for

stress avoidance so long as the Agency was denying reasonable accommodation.

288.   As a direct and proximate result of the Agency's unlawful denial of FMLA benefits,

Plaintiff has suffered:

a.   Loss of her employment, benefits, Social Security and retirement contributions and

earnings, at an age where she is unlikely to be able to recover;

b.   Loss of her pension three years before full vesting;

c.   Loss of her legal career stature and reputation and advancement;

d.   Loss of her private practice earnings which she left on the promise of stable

Government employment with meaningful civil service protections and Due Process;

e.   Unreimbursed medical expenses;

f.   Severe emotional and mental distress and physical stress requiring substantial

ongoing medical treatment;

g.  Attorney's fees and costs.

## COUNT THREE, AGE DISCRIMINATION, AGE DISCRIMINATION IN EMPLOYMENT ACT, 29 U.S.C. §§ 621, ET SEQ.

Paragraphs (1) through (282), inclusive, are incorporated as paragraphs (1) through (282) herein.

Paragraphs 283 through 288 are skipped to resume at 289.

289.  Defendant subjected Plaintiff to intentional discrimination and harassment in the terms, conditions, and privileges of employment on account of her age in one or more of the following ways:

a.  By subjecting Plaintiff to harassment and investigation by false accusations of incompetence, insubordination, goldbricking, fraud as pretextual reasons to remove her from her employment;

b.  By selective enforcement of its purported personnel and disciplinary rules and policies or creating rules and policies against Plaintiff based on her sex;

c.  By failing or refusing to adequately train its employees in the employment rights of older employees and the duties of supervisors, managers, EEO officials, Human Resources officials, and attorneys;

d.  By failing or refusing to maintain a reasonable and meaningful process for older employees to make complaints of discrimination and harassment, and investigation and remedy of complaints;

e.  By failing or refusing to conduct a meaningful investigation of the harassing and discriminatory conduct toward Plaintiff by its supervisory personnel, EEO and HR personnel, and attorneys;

f.  By failing or refusing to take corrective action, including reinstating Plaintiff or

hiring her in an equivalent other position, and disciplining and training its personnel.

290. The reasons the Agency gives for its adverse employment actions and harassment against Plaintiff are pretexts for intentional age discrimination and animus.

291. As a direct and proximate result of the Agency's unlawful intentional age discrimination, Plaintiff has and will continue to suffer:

    a. Loss of her employment, benefits, Social Security and retirement contributions and earnings, at an age where she is unlikely to be able to recover;

    b. Loss of her pension three years before full vesting;

    c. Loss of her legal career stature and reputation and advancement;

    d. Loss of her private practice earnings which she left on the promise of stable Government employment with meaningful civil service protections and Due Process;

    e. Job hunting expenses;

    f. Unreimbursed medical expenses;

    g. Severe emotional and mental distress and physical stress requiring substantial ongoing medical treatment;

    h. Attorney's fees and costs.

## COUNT FOUR, SEX DISCRIMINATION, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e, AMENDED BY THE CIVIL RIGHTS ACT OF 1991.

Paragraphs (1) through (282), inclusive, are incorporated as paragraphs (1) through (282) herein.

Paragraphs 283 through 291 are skipped to resume at 292.

292. Defendant subjected Plaintiff to intentional discrimination and harassment in the terms, conditions, and privileges of employment on account of her sex in one or more of the following ways:

    a. By subjecting Plaintiff to harassment and investigation by false accusations of

incompetence, insubordination, goldbricking, fraud as pretextual reasons to remove her from her employment with no such acts against males. For example, labeling her a violent threat, a firearms threat with no basis in reality and nothing meaningful done to control or punish actually violent males;

b. By selective enforcement of its purported personnel and disciplinary rules and policies or creating rules and policies against Plaintiff based on her sex;

c. Male management allowing females abuse Plaintiff on account of their sex. The deputy commander a male used the women to abuse Plaintiff for example saying he, the male, must protected women who cry, as justification to remove Plaintiff's duties and defame her;

d. Outright giving Plaintiff's job, all her duties, that she has three decades experience in two capacities in, one of the most complex legal practices (labor and employment), to an early age 20s totally inexperienced untrained male having expressed no interest in this practice when hired;

e. By failing or refusing to adequately train its employees in the employment rights of employees of whatever sex and the duties of supervisors, managers, EEO officials, Human Resources officials, and attorneys;

f. By failing or refusing to maintain a reasonable and meaningful process for persons of whatever sex to make complaints of discrimination and harassment, and investigation and remedy of complaints;

g. By failing or refusing to conduct a meaningful investigation of the harassing and discriminatory conduct toward Plaintiff by its supervisory personnel, EEO and HR personnel, and attorneys;

h. By failing or refusing to take corrective action, including reinstating Plaintiff or hiring her in an equivalent other position, and disciplining and training its personnel.

293. The reasons the Agency gives for its adverse employment actions and harassment against Plaintiff are pretexts for intentional sex discrimination and animus.

294. As a direct and proximate result of the Agency's unlawful intentional sex discrimination, Plaintiff has and will continue to suffer:

a. Loss of her employment, benefits, Social Security and retirement contributions and earnings, at an age where she is unlikely to be able to recover;

b. Loss of her pension three years before full vesting;

c. Loss of her legal career stature and reputation and advancement;

d. Loss of her private practice which she left on the promise of stable Government employment with meaningful civil service protections and Due Process;

e. Job hunting expenses;

f. Unreimbursed medical expenses;

g. Severe emotional and mental distress and physical stress requiring substantial ongoing medical treatment;

h. Attorney's fees and costs.

**COUNT FIVE, HARASSMENT AND HOSTILE ENVIRONMENT, TITLE VII, 42 U.S.C. § 2000e, ET SEQ., AMENDED BY THE CIVIL RIGHTS ACT OF 1991.**

Paragraphs (1) through (282), inclusive, are incorporated as paragraphs (1) through (282) herein.

Paragraphs 283 through 294 are skipped to resume at 295.

295. At substantially all times of her employment with the Agency, the harassment of Plaintiff alleged herein was severe and pervasive.

296. The acts of discrimination, harassment and retaliation alleged herein made a hostile work

environment for Plaintiff throughout her tenure with the Agency.

297.   As a direct and proximate result of the Agency's unlawful harassment and hostile work

environment, Plaintiff has and will continue to suffer:

a.   Loss of her employment, benefits, Social Security and retirement contributions and

earnings, at an age where she is unlikely to be able to recover;

b.   Loss of her pension three years before full vesting;

c.   Loss of her legal career stature and reputation and advancement;

d.   Loss of her private practice which she left on the promise of stable Government

employment with meaningful civil service protections and Due Process;

e.   Job hunting expenses;

f.   Unreimbursed medical expenses;

g.   Severe emotional and mental distress and physical stress requiring substantial

ongoing medical treatment;

h.   Attorney's fees and costs.

**COUNT SIX, RETALIATION, TITLE VII, 42 U.S.C. § 2000e, ET SEQ., AMENDED BY THE CIVIL RIGHTS ACT OF 1991.**

Paragraphs (1) through (282), inclusive, are incorporated as paragraphs (1) through (282) herein.

Paragraphs 283 through 297 are skipped to resume at 298.

298.   Plaintiff's EEO complaints in any form are protected activities.

299.   Plaintiff's legal advice about what EEO compliance required is protected activity.

300.   As a direct and proximate result of the Agency's unlawful retaliation against Plaintiff for

her protected EEO activities, Plaintiff has and will continue to suffer:

a.   Loss of her employment, benefits, Social Security and retirement contributions and

earnings, at an age where she is unlikely to be able to recover;

b. Loss of her pension three years before full vesting;

c. Loss of her legal career stature and reputation and advancement;

d. Loss of her private practice which she left on the promise of stable Government employment with meaningful civil service protections and Due Process;

e. Job hunting expenses;

f. Unreimbursed medical expenses;

g. Severe emotional and mental distress and physical stress requiring substantial ongoing medical treatment;

h. Attorney's fees and costs.

## COUNT SEVEN, WHISTLEBLOWER REPRISAL, WHISTLEBLOWER PROTECTION ENHANCEMENT ACT, 5 U.S.C. § 2302(b)(8), AS AMENDED.

Paragraphs (1) through (282), inclusive, are incorporated as paragraphs (1) through (282) herein.

Paragraphs 283 through 300 are skipped to resume at 301.

301. Plaintiff's reports or complaints any form alleged elsewhere herein are reports of fraud, waste, abuse, mismanagement, violations of law, rules, policies, and are protected communications under the WPEA.

302. Plaintiff's EEO complaints in any form are protected activities and protected communications in that they report fraud, waste, abuse, mismanagement, violations of law, rules, policies.

303. As a direct and proximate result of the Agency's unlawful reprisal, Plaintiff has and will continue to suffer:

a. Loss of her employment, benefits, Social Security and retirement contributions and earnings, at an age where she is unlikely to be able to recover;

b. Loss of her pension three years before full vesting;

c.  Loss of her legal career stature and reputation and advancement;

d.  Loss of her private practice earnings which she left on the promise of stable Government employment with meaningful civil service protections and Due Process;

e.  Job hunting expenses;

f.  Unreimbursed medical expenses;

g.  Severe emotional and mental distress and physical stress requiring substantial ongoing medical treatment;

i.  Attorney's fees and costs.

**COUNT EIGHT, CIVIL SERVICE REFORM ACT, 5 U.S.C. § 7703(b)(2)**

Paragraphs (1) through (282), inclusive, are incorporated as paragraphs (1) through (282) herein.

Paragraphs 283 through 303 are skipped to resume at 304.

304.  As alleged elsewhere herein, the Agency did not have sufficient justification to deny reasonable accommodation, discipline, remove duties, and remove Plaintiff from her position, as the proffered justification was pretextual and discriminatory, retaliatory and done as reprisal for protected communications and activities.

305.  As alleged elsewhere herein, the Agency acted without authorization to disclose Plaintiff's personnel and medical information and records, "PII," without consent or legal authorization, because its officials acted outside the limited purposes for which a medical opinion may be obtained and acted outside the requirements even if they were within an authorized purpose.

306.  As alleged elsewhere herein, the Agency failed to provide Plaintiff reasonable accommodation and judged her performance without it or in retaliation for it.

307.  As alleged elsewhere herein, the Agency failed to offer Plaintiff any performance

improvement program in lieu of or prior to removal.

308. As alleged elsewhere herein, the Agency failed to offer Plaintiff another position in lieu or prior to removal as required by OPM regulations to effect a removal for medical incapability to perform.

309. As alleged elsewhere herein, the Agency denied Plaintiff even the chance to compete for two attorney positions at Fort Hamilton, one with USACE which had a build-in accommodation of liberal telework from anywhere. The Agency acted outside OPM rules to deny Plaintiff the opportunity to compete while Plaintiff's appeal was still pending with MSPB. The AJ aware of the first one and comments that she might hear it and never mentioned it again.

310. Those hiring processes were irregular enough to be prohibited personnel practices.

311. The MSPB appeal process was irregular enough to deny Plaintiff Due Process and Equal Protection.

312. The MSPB AJ was conflicted and failed to recuse herself or inform Plaintiff she was and or an Agency lawyer, JAG Officer. It is at least an appearance of impropriety requiring recusal.

313. Recusal was compelled because of the compelling Due Process and Equal Protection interests of the Plaintiff which the appeal exists to protect.

314. As a direct and proximate result of the Agency's prohibited personnel practices, Plaintiff has and will continue to suffer:

    a. Loss of her employment, benefits, Social Security and retirement contributions and earnings, at an age where she is unlikely to be able to recover;

    b. Loss of her pension three years before full vesting;

c.  Loss of her legal career stature and reputation and advancement;

d.  Loss of her private practice earnings which she left on the promise of stable
    Government employment with meaningful civil service protections and Due Process;

e.  Job hunting expenses;

f.  Unreimbursed medical expenses;

g.  Severe emotional and mental distress and physical stress requiring substantial
    ongoing medical treatment;

j.  Attorney's fees and costs.

**COUNT NINE, UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT
RIGHTS ACT, 38 U.S.C. §§ 4301, ET SEQ., AS AMENDED BY THE VETERANS
OPPORTUNITY TO WORK / HIRE HEROES ACT OF 2011, PUBLIC LAW 112-56, 20
C.F.R. § 1002.**

Paragraphs (1) through (282), inclusive, are incorporated as paragraphs (1) through (282) herein.

Paragraphs 283 through 314 are skipped to resume at 315.

315.  As alleged herein, Plaintiff is a member of the "uniformed services" for 38 U.S.C. §
      4303(16), at all times relevant herein was serving "in the uniformed service" for 38
      U.S.C. § 4303(13).

316.  Plaintiff is an "employee" under 38 U.S.C. § 4303(3).

317.  Plaintiff always had under five years of cumulative military service within her GS
      employment with the Agency.

318.  As alleged elsewhere herein, Plaintiff's son is a service-connected disabled Veteran of
      the Agency residing with her.

319.  Agency supervisors and programs heads harassed and discriminated against Plaintiff
      based on her military service or affiliation. In addition to what is alleged elsewhere
      herein, the Agency:

a.  Asking how long her reserve service will continue, starting when hiring her, and repeating when Plaintiff's service continued longer than expected. LEE and her deputy told Plaintiff she should retire from military service;

b.  Denied her military leave benefits she was owed the day she began work, for a few years and strong demand for it by Plaintiff;

c.  Hired no military members or Veterans for the New York District legal office after Plaintiff and another reservist hired together in 2010;

d.  Harassed her and her reserve commander demanding curtailment of her ordinary military duty for pretextual illegitimate purposes;

e.  Accused her of fraud because she performed part-time reserve duty while seeking reasonable accommodation for her full-time work with the same Agency;

f.  Directed Plaintiff she may not mention her disabled Veteran son in the workplace, because her son was disabled by abuse by the Agency's Engineering officers, in particular her supervisor attacked a conversation Plaintiff had about her son with another military Veteran of this Agency who inquired and instigated coworkers to participate;

g.  Numerous acts of severe harassment times around her son's medical treatment;

h.  Numerous hostile and threatening comments made to Plaintiff about her son that she should not seek anything for him from the Agency, implying his injuries are a fraud;

i.  Supervisors and program heads and command officers acted in concert to publicly state expressly literally that Plaintiff is a "violent threat" who will perpetrate a workplace shooting for the sole reason that she receives firearms training is in the military reserve. Management used that to remove Plaintiff's duties as a step toward

the removal they later completed.

320. The acts and words regarding Plaintiff's service and her affiliation with her son is animus. Any justification the Agency offers for its conduct is pretextual.

321. As a direct and proximate result of the Agency's USERRA violations, Plaintiff has and will continue to suffer:

   a. Loss of her employment, benefits, Social Security and retirement contributions and earnings, at an age where she is unlikely to be able to recover;

   b. Loss of her pension three years before full vesting;

   c. Loss of her legal career stature and reputation and advancement;

   d. Loss of her private practice earnings which she left on the promise of stable Government employment with meaningful civil service protections and Due Process;

   e. Job hunting expenses;

   f. Unreimbursed medical expenses;

   g. Severe emotional and mental distress and physical stress requiring substantial ongoing medical treatment;

WHEREFORE, Plaintiff seeks the following legal and equitable relief, and such other relief as the Court may deem appropriate:

1) Reinstatement or hire in a commensurate or higher grade position, under all Counts and pursuant to the Civil Rights Act of 1991;

2) Back pay and benefits, including but not limited to FERS pension, TSP contributions and earnings, Social Security credits, under all Counts and pursuant to the Civil Rights Act of 1991;

3) Front pay for loss of professional career, under all Counts and pursuant to the Civil Rights Act of 1991;

4) Compensatory damages including but not limited to reputational harm, job hunting expenses, unreimbursed medical expenses, mental/emotional distress pain and suffering and pursuant to the Civil Rights Act of 1991;

5) A consent agreement or Order directing Defendant to:

   a. Remove or segregate any medical information it maintains about Plaintiff;

   b. Remove or segregate any disciplinary, adverse or negative information it maintains about Plaintiff;

   c. Provide Plaintiff an annual evaluation ("TAPES") for the period from 2015 to April 15, 2017 which is commensurate with the last evaluation covering 2014-15;

   d. Provide training and consultation on the requirements of reasonable accommodation to its managers and attorneys from the organization provided by the USEEOC and USDOL for that purpose at no Agency cost, Job Accommodation Network, "JAN";

   e. Provide adequate discipline up to and including removal for its managers, officers and attorneys who acted contrary to the statutes in each Count herein.

f.  Reasonable attorney's fees and costs under the applicable lodestar and pursuant to the

Civil Rights Act of 1991 and Equal Access to Justice Act.

**PLAINTIFF, PRO SE,**

Dated: 10/16/2018

Susan V. Wallace
8201 4th Avenue, Apt 3J
Brooklyn, NY 11209
Cell 860-655-6024
svwhome@yahoo.com

CERTIFICATION OF SERVICE

The undersigned certifies that a true and accurate copy of the foregoing is served this 16th day of
October 2018 to: Tomoko Onozawa, U.S. Attorney's Office, SDNY, 86 Chambers Street, New
York, NY 10007, via email tomoko.onozawa@usdoj.gov

Susan V. Wallace, Pro Se