USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 03/31/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SUSAN WALLACE,

> Plaintiff,

v.

CHRISTINE WORMUTH, in her official
capacity as Secretary, Department of the
Army,

> Defendant.

---

No. 18-CV-6525 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiff Susan Wallace brings this action against Christine Wormuth in her official capacity as Secretary of the United States Army, where Plaintiff was formerly employed as an attorney. She raises claims of: failure to reasonably accommodate pursuant to the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*; age discrimination pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; gender discrimination and hostile work environment pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e) *et seq.*; and whistleblower reprisal pursuant to the Whistleblower Protection Enhancement Act ("WPA"), 5 U.S.C. § 2302(b)(8).[1] She also seeks review of a decision of the Merits System Protection Board ("MSPB") affirming her removal from the Army, pursuant to the Civil Service Reform Act, 5 U.S.C. § 7703. Now before the Court is Defendant's motion for summary judgment. For the reasons that follow, the motion is granted except as to Plaintiff's appeal of the MSPB's decision, which is remanded for consideration of her WPA affirmative defense.

---

[1] Plaintiff has voluntarily withdrawn her Title VII retaliation claim. Opp. MOL 1 n.1. Accordingly, the Court dismisses that claim without prejudice. *See Hahn v. Bank of Am. Inc.*, No. 12-cv-4151 (DF), 2014 WL 1285421, at *11-12 (S.D.N.Y. Mar. 31, 2014).

# BACKGROUND

## I.    Facts[2]

The following facts are drawn from the parties' Rule 56.1 statements, the Declaration of Lorraine Lee, the Declaration of Rachel L. Doud and attached exhibits, the Declaration of Matthew Marks and attached exhibits, the Supplemental Declaration of Matthew Marks and attached exhibit, and the administrative record ("AR").  The Court notes when facts are disputed.

### A.    Background Facts and Asserted Discriminatory Comments

From May 2010 to April 2017, Plaintiff was employed as a General Attorney for the U.S. Army Corps of Engineers ("the Agency"), working at the New York City District Office of Counsel.  Def. R. 56.1 ¶¶ 1-2.  Plaintiff's first-line supervisor was Lorraine Lee and her second-line supervisor was Maureen McAndrew.  *Id.* ¶ 3.  Throughout her employment as a General Attorney, Plaintiff was also a Judge Advocate General in the National Guard and served her duty at the Fort Hamilton Garrison Army law office in Brooklyn.  *Id.* ¶ 4.

Plaintiff was required "to provide legal advice, guidance, and direction to staff within the Agency and on behalf of the Agency, often with respect to difficult factual and legal questions and matters concerning large sums of money."  *Id.* ¶ 5.  Her duties included research; preparing litigation reports; drafting answers; preparing for cases with pending hearings; interviewing individuals; and having contact with hearing officers, judges, Department of Justice personnel, and high-level Army personnel.  *Id.* ¶¶ 6-8.  Plaintiff was required to work under Lee's supervision. *Id.* ¶ 9.  Prior to 2016, she focused on labor and employment issues.  *Id.* ¶ 10.

---

[2] Plaintiff's brief recites a host of facts that are not mentioned in her Rule 56.1 statement, many of which occurred years before the facts that underlie her claims.  The Court discusses only those facts that are clearly relevant to her arguments on summary judgment.

Plaintiff was 52 years old when she was hired by Lee, who is herself three years older than Plaintiff. *Id.* ¶¶ 98-99. Several other attorneys in Plaintiff's office were older than her. *Id.* ¶¶ 100-01. When one attorney retired in 2014, he was replaced by Kyle Hayden, *id.* ¶ 102, whom Plaintiff characterized during her MSPB hearing as a "very young lawyer . . . with zero experience and training" in labor and employment law, Marks Dec. Ex. A ("MSPB Tr.") at 46:16-17. At the time of Plaintiff's termination, seven out of ten lawyers in the New York office were female. Def. R. 56.1 ¶¶ 103-04. The lawyer the Agency hired to fill Plaintiff's position was also a woman. *Id.* ¶ 105.

Plaintiff asserts that Agency employees made ageist and sexist comments during her tenure. First, she testified that in 2015, Lee and McAndrew announced a "new policy" from the Agency's chief counsel that the Agency was "getting rid of old lawyers" and "want[ed] young lawyers." Marks Dec. Ex. B ("Wallace Dep.") at 157:21-158:13, 159:1-5. Lee and McAndrew refuted this in their depositions. Doud Dec. Ex. B at 148:23-149:10; *id.* Ex. F at 37:16-38:7. Second, she testified that at unspecified times, an Agency Equal Employment Opportunity ("EEO") employee named Estelle Capowski stated in emails that she "want[ed] a male lawyer" and that other unspecified individuals wanted a male lawyer to work on a particular matter that she was assigned to. Supp. Marks Dec. Ex. D ("Wallace MSPB Dep.") at 487:22-488:9.

### B. Complaints Regarding Plaintiff's Performance and Behavior and Plaintiff's Contemporaneous Protected Activity

As Lee testified during the MSPB hearing, she had given Plaintiff "excellent performance evaluations" for several years, with the last such evaluation in 2015. MSPB Tr. at 391:11-15. Around that time, however, individuals began complaining about Plaintiff's work performance and behavior toward other employees. Plaintiff does not dispute the existence of these complaints, only their veracity.

In October 2014, Plaintiff's second-line supervisor, Maureen McAndrew, received a memo from the Civilian Advisory Personnel Center.  Def. R. 56.1 ¶ 107.  According to the memo, Plaintiff, in her capacity as a labor attorney for the Agency, had repeatedly and baselessly accused Agency employees who were raising medical issues of acting fraudulently.  *Id.* ¶ 108; Doud Dec. Ex. C ("October 2014 Memo") at 1.  For instance, the memo described times that Plaintiff had incorrectly or baselessly asserted: that an employee was hired based on fraudulent paperwork and that a doctor who had diagnosed that employee with a medical condition might be guilty of fraud; that another employee had lied about being pregnant and having a child as an excuse to get out of work; and that an EEO complaint had been filed against a third employee.  October 2014 Memo at 1-3.  According to the memo, two individuals had filed EEO complaints against Plaintiff as a result of her conduct.  *Id.* at 3.  The memo further stated that Plaintiff had caused excessive delays and difficulties in Agency arbitrations and contracts to which she was assigned.  *Id.* at 4-5.

In response, Lee redistributed the workload in the District Office to remove Plaintiff from certain cases.  Where both Plaintiff and Hayden "had each previously worked on both New York District and ACE-IT[3] labor cases," Lee "redistributed the cases so that Hayden worked on New York District labor cases and [Plaintiff] did the labor work for ACE-IT."  Def. R. 56.1 ¶¶ 109-11.

Plaintiff does not dispute the memo's existence but argues that all her actions were justified.  For instance, she maintains that the memo's author, who worked for the Agency's EEO office, had fraudulently asserted an employee was eligible for disability without conducting the requisite reasonable accommodation analysis, and that after Plaintiff reported this, the Agency destroyed the fraudulent documents over Plaintiff's objection.  Wallace MSPB Dep. at 150:13-

---

[3] ACE-IT is the Agency's IT enterprise organization.  Lee Decl. ¶ 9.

153:14.[4]   As to the pregnant employee, Plaintiff explains that she "was suspicious that [the employee] did not actually have a child" because she "never appeared pregnant"; would not "give medical documentation"; and went on leave, announced a pregnancy, announced a miscarriage, and then announced a pregnancy "all in a really short period of time." *Id.* at 119:17-120:11.

Plaintiff also contends that the 2014 work redistribution occurred "due to her complaints of failing to follow EEO procedures and the retaliation she was experiencing." Pl. R. 56.1 ¶ 110. It is unclear precisely which "complaints" Plaintiff is referring to when she describes her "complaints of failing to follow EEO procedures."  In addition to the complaints she made about Agency employees not following the reasonable accommodation process before approving disability, she also testified that the Agency took "all [her] duties away in 2013 to 2014" after Agency employee Estelle Capowski "started making false EEO complaints against [Plaintiff] to try to get employees make EEO complaints against [her] . . . to get even with [her] for [her] EEO activities."  Wallace MSBP Dep. at 283:21-284:7.  Plaintiff had then expressed dissatisfaction to Lee regarding the way that those complaints had been handled.  *Id.* at 285:14-286:21 (describing her complaints about not being informed that the investigation against her had ended). Accordingly, the "complaints" that she asserts triggered the October 2014 reassignment may have been her complaints about others' purported misconduct as described in the October 2014 memo; her complaints to Lee about how the EEO complaints against her were handled; both; or neither.

On February 9, 2016, Plaintiff made "initial contact" with the EEO Office.  Def. R. 56.1 ¶ 123.  In her formal EEO complaint filed months later, she described this initial contact as an oral complaint to an EEO counselor at Agency headquarters that she was "the victim of unlawful discrimination, harassment and retaliation for prior EEO activities."  Doud Dec. Ex. D at 84.

---

[4] Plaintiff also testified that McAndrew created a false record that was submitted in a federal court action, *see* Wallace MSPB Dep. at 172:22-173:8, but it is unclear what relationship this has to the events discussed in the memo.

On or before February 25, 2016, the Chief of Staff for ACE-IT, Daniel Klein, requested that Lee remove Plaintiff from all labor and employment work for ACE-IT. According to Klein, while ACE-IT had made "every effort to work with [Plaintiff], her lack of responsiveness, inaccurate [legal] advice, and overall philosophical differences with numerous senior management officials, in virtually every case she has been assigned, ha[d] resulted in duplication of effort, unnecessary work, and additional costs." Def. R. 56.1 ¶¶ 11-12; AR 899-900 (email from Klein noting that three other ACE-IT officials had requested Plaintiff's reassignment). Plaintiff acknowledges this communication but asserts that Klein's complaint occurred shortly after Plaintiff had complained about his use of a racial slur. Pl. R. 56.1 ¶ 11. In support, though, she cites only her unsworn EEO complaint. AR 213. In response to Klein's complaint, Lee reassigned Plaintiff's ACE-IT work to Hayden. Def. R. 56.1 ¶¶ 113-14. This left Plaintiff with a caseload that included "civil works litigation, ethics issues, tort claims, and an admiralty case." Id. ¶ 115.

On either February 6 or 22, Plaintiff sent an email to the Agency chief counsel, McAndrew, and Lee "complaining about the Office's failure to follow proper policies, the misconduct detailed above regarding the Office's harassment of Wallace for trying to perform her duties, and taking away more of Wallace's job responsibilities." Opp. MOL at 16; Wallace MSPB Dep. at 229:15-18, 248:16-251:12. Plaintiff testified that this email was in response to her reassignment from ACE-IT work. Wallace MSPB Dep. at 251:7-19.

According to Defendant, Plaintiff failed to timely provide a list of the ACE-IT matters she was working on to facilitate the reassignment of those cases to Hayden. Def. R. 56.1 ¶ 14. Based on this failure and on Plaintiff's failure to timely provide a memo, Lee issued Plaintiff a reprimand order on March 7. Id.; AR 1518-20 (reprimand memo). Plaintiff responds that she submitted the memo only two hours late and that Lee "had failed to provide proper instruction for the

memorandum and [the] memorandum was based upon cases that [she] had not been working on for almost a month."  Pl. R. 56.1 ¶ 14; Wallace MSPB Dep. at 253:14-256:22.

After this reassignment, Plaintiff's remaining duties included negotiating a collective bargaining agreement.  Def. R. 56.1 ¶ 116.  In March 2016, the New York District Deputy Commander complained that Plaintiff "was slow in responding to requests and was having difficulty working with the other members of the team, impeding the agreement from moving forward."  Lee Decl. ¶ 14.  Lee added herself and Hayden to the team in response, but ultimately removed Plaintiff from the team when "her performance issues continued."  *Id.*  Plaintiff disputes this, citing an email she sent in March 2016 in which she stated that the "Union president has offered to testify that he never said he want[ed] [Plaintiff] removed from [her] labor and employment work or ha[d] any issue working with [Plaintiff]"; that the union president said "that he had told management that [Plaintiff had] SAVED the negotiations from the morass that management put it in"; and that he did "not want [her] taken off the contract."  AR 1754.

On March 24, 2016, Lee had a counseling meeting with Plaintiff to discuss her performance.  Def. R. 56.1 ¶ 15.  In a memo from Lee to Plaintiff summarizing the meeting's objectives, Lee described the complaints from Klein and the Deputy Commander.  AR 1501.  The memo also warned Plaintiff about criticizing and demeaning the work performed by her colleagues; providing unsolicited business advice to clients; and providing legal advice in piecemeal and confusing fashion.  *Id.* at 1501-04; *see, e.g.*, *id.* at 1504 ("Feedback from others has indicated that you often deal with them in a bullying and directive manner.  This is counterproductive and has impacted your ability to provide legal services.").  According to Lee, Plaintiff left the meeting before it ended and refused to continue the conversation.  Def. R. 56.1 ¶ 16; AR 1625 (memo documenting her early departure).  Plaintiff disputes leaving early.  Wallace

MSPB Dep. at 437:14-17 ("Q: And you walked out and you refused to come back?  A: No. Oh, no.  Absolutely not.  That's a lie.").  She also testified that the memo Lee had written summarizing the meeting's objectives was "fake and another fraudulent document."  *Id.* at 443:4-5.

### C.    Plaintiff's Request for Accommodation

On March 31, 2016, Lee sent Plaintiff an email with the subject line "Real Estate Actions" that read, in full, "Please confirm that you have spoken to Dean and Rich about the two actions.  Thanks."  AR 2414.  That day, Plaintiff forwarded Lee's email to three Agency officials, stating that it constituted "unlawful harassment, EEO retaliation and [whistleblower reprisal]."  AR 2413.  She wrote that Lee had never "dogged" Plaintiff about assignments before Plaintiff's February 22 email and expressed her concern that Lee's emails were "intended to create a misleading paper trail that [Plaintiff was] not performing her duties."  *Id.*  Finally, she discussed her cardiac issues and complained that Lee was "not accommodating [her] illness, she was causing and exacerbating it."  *Id.* at 2414.

On April 5, 2016, Lee instructed Plaintiff to have a litigation hold document ready by April 7 and a memorandum ready by April 8.  Def. R. 56.1 ¶ 17; AR 1234.  Plaintiff protested that these deadlines were not "reasonable or possible"; that Lee had never imposed such strict deadlines before her February 22 complaint email; that Plaintiff's "requests and obvious need for reasonable accommodation have not received the required response of the interactive process to find accommodation"; and that these "clearly unreasonable/impossible deadlines with an arbitrary and capricious basis [were] denying [her] reasonable accommodation of [her] stress and cardiac conditions."  AR 1233-34.  Lee emailed back several days later, explaining that she had "not [been] aware that [Plaintiff] may require a reasonable accommodation."  AR 1233.  She requested Plaintiff's accommodation request and medical documentation to "begin the process."  *Id.*

Plaintiff disputes Lee's lack of knowledge of her disability, citing an email to Lee in which she stated: "I did have some cardiac arrythmia, and PTSD, prior, and you knew that, because I've told you that since at least early 2013 . . . [y]ou know that I ended up with a life-threatening arrythmia and had heart surgery Sep 2013." Pl. R. 56.1 ¶ 19; AR 1177. The parties also dispute whether Plaintiff provided requested documentation after this email exchange; neither party cites to any part of the record that supports their position. Def. R. 56.1 ¶ 20; Pl. R. 56.1 ¶ 20.

### D.     April and May Meetings with Lee and McAndrew

On April 20, 2016, Lee and McAndrew attempted to meet with Plaintiff to issue a proposed temporary suspension. Def. R. 56.1 ¶ 21; AR 1507 (memo to file written by Lee). The proposed suspension was due to Plaintiff's "insubordination" during the March 24 meeting, "disrespectful conduct towards a superior," "creating a disturbance," and "failure to follow instructions." AR 1625-26 (notice of suspension memo). Plaintiff refused to sign the notice of proposed suspension or acknowledge receipt of it. Instead, she left the meeting, making statements about her "heart . . . pounding" or "beating really fast," and/or about needing "to go to the health unit" while "mentioning a heart attack." Def. R. 56.1 ¶ 23; AR 1507 (Lee's memo describing the meeting); 1509 (McAndrew's memo describing the meeting). Plaintiff was on medical leave for the next few weeks. Wallace Dep. at 120:3-5.

The parties dispute whether Lee and McAndrew harassed Plaintiff during this meeting. In her deposition, Plaintiff gives the following account:

> Lee pushed me into the [conference] room [and] she didn't push me with her hands, she got her belly on me. Like I said, she's very, very large, you've seen her I'm sure, and she—like I had to move forward or I'd trip, I'd fall over, you know what I mean. It was so weird, but she got right on me and bumped me forward. The other one, McAndrew, McAndrew had me up against the bookcase, which all these walls are lined with bookshelves. I'm up against the bookcase, I can't move, she was two inches from my face screaming in my face, her eyes right in my eyes. She had her hand up, one hand up with this kind of, you know, like, you know, the fist up, the hand up thing . . . I was thinking that she was going to hit me.

*Id.* at 109:9-110:4.  She also testified that Lee locked the door to the conference room while McAndrew was harassing her.  *Id.* at 105:7-9.  Lee and McAndrew deny any harassment, and Defendant acknowledges only that Lee accidentally "bump[ed] Plaintiff forward" as she walked into the room.  AR 1507, 1509; Def. R. 56.1 ¶ 120.

Lee and McAndrew met with Plaintiff again when she returned from medical leave on May 2, 2016, this time to issue her a notice to comply with an investigation that had been initiated in response to complaints she had made.  Def. R. 56.1 ¶ 25; MSPB Tr. at 300:13-25 (Lee's MSPB testimony).  Again, the parties' accounts of this meeting diverge drastically.  According to Defendant, Plaintiff refused to accompany Lee and McAndrew to a conference room to conduct the meeting, so Lee and McAndrew decided to give Plaintiff the notice in her office.  Def. R. 56.1 ¶ 26; AR 1512, 1514 (Lee and McAndrew memos).  McAndrew closed the door to Plaintiff's office to give her privacy.  AR 1512.  She then stepped to the side of Plaintiff's desk, placed the notice on the desk, and asked her to sign the notice acknowledging receipt.  *Id.*  Plaintiff asked for a lawyer, and McAndrew explained that she was not entitled to one.  *Id.*  Plaintiff then refused to take the notice and stated that McAndrew was trapping her in the office and that she felt threatened. *Id.*  McAndrew asserts that as soon as Plaintiff stated this, she opened the door to the office, said, "I am not threatening you," and gave Plaintiff unobstructed access to the door.  AR 1515.  Plaintiff repeated that she felt threatened.  *Id.*  She then called Federal Protective Services ("FPS"), stating that she was "being threatened and harassed."  *Id.*; AR 1512.  McAndrew then stepped outside the office and wrote on the notice of investigation that Plaintiff had refused to sign.  AR 1515.  FPS arrived, spoke to Plaintiff, Lee, and McAndrew, and escorted Plaintiff from the office.  AR 1512, 1516.  Lee and McAndrew deny making any threatening comments to Plaintiff or trapping her in her office.  AR 1512, 1514-16.  Plaintiff was allowed to telework for the rest of that day.  AR 1512.

Plaintiff, by contrast, asserts that she was harassed and threatened during this meeting in an almost identical manner to the alleged harassment during the April meeting.  She states that

> as she was preparing to enter [her] office, Lee appeared out of nowhere and once again pushed Wallace and McAndrew walked by, keeping [Plaintiff] trapped in her area near her desk with Lee holding the latch so that [she] could not leave. McAndrew kept approaching [Plaintiff] as [she] backed away until [she] was up against her bookshelves.  McAndrew again kept asking [Plaintiff] who she had spoken to, referring to the fraud complaints that [she had] made.  [Plaintiff] asked McAndrew to stop, but she did not.  [Plaintiff] called the police.

Pl. R. 56.1 ¶ 25; *see* Wallace Dep. at 120:17-126:18 (describing being "bumped" by Lee, trapped in an office, and backed up against the wall by McAndrew while McAndrew aggressively asked Plaintiff what she had "told" others regarding her fraud complaints).

Plaintiff's suspension was sustained on May 19.  Def. R. 56.1 ¶ 24.

### E.      Reasonable Accommodation Negotiations

The day after the May 2 meeting, Plaintiff requested that she be allowed to telework for the rest of the week as a "reasonable accommodation."  Def. R. 56.1 ¶ 29; AR 1228.  Lee allowed Plaintiff to telework for an additional day, and later for the remainder of the week; she noted that while she was "willing to engage in the interactive process and consider any request for a reasonable accommodation when [Plaintiff] submit[ted] the required medical documentation," this temporary allowance was "unrelated to [her] request for reasonable accommodation."  Def. R. 56.1 ¶ 31; AR 1227-28 (email chain).

Plaintiff underwent a cardiac procedure on May 6, 2016 and remained in the hospital until May 19.  Def. R. 56.1 ¶ 32.  On May 20, Plaintiff's lawyer emailed Lee advising her of this information and requesting that Plaintiff be permitted to telework starting May 23.  AR 492.  The email attached a note from Plaintiff's physician, Dr. Michael Walton, which read:

> Patient Susan V. Wallace has been under hospital care at NYU Langone Medical Center from May 6, 2016 until her discharge date May 19, 2016.  The patient may

11

> return to work on May 23, 2016 by telework in her home to continue pending
> further treatment and evaluation on an outpatient basis.  The patient is to avoid
> stressors to the extent feasible.  The patient is to avoid travel outside the New York
> City area pending further treatment and evaluation on an outpatient basis.

AR 493.  A lawyer for the Agency replied on May 23, explaining that its accommodation specialist

had reviewed Walton's letter but that the Agency still required "documentation about [Plaintiff's]

condition and her functional limitation," including "the nature, severity and duration of [her]

impairment, the activity or activities the impairment limits, the extent to which the impairment

limits [her] ability to perform the activity or activities and why [she] requires the reasonable

accommodation requested and how it will enable [her] to perform the essential functions of the

job."  AR 496-97.  Plaintiff's counsel replied that the information that had been provided was

sufficient to justify "a temporary accommodation of telework."  AR 495.  Counsel then provided

the following additional information in the body of an email:

> Ms. Wallace is currently being treated for Mitral valve prolapse, cardiac
> arrhythmias and elevated blood pressure, bipolar disorder, depression, anxiety, and
> post-traumatic stress disorder. She also has episodes of atrial fibylation [sic].  In
> addition and as noted above, she had a cardiac procedure performed on May 6 2016.
> As a result of Ms. Wallace's condition, Dr. Walton opined that Ms. Wallace could
> return to work by telework pending further treatment.  His finding is evidenced by
> the correspondence previously submitted.

AR 496.  The Agency lawyer responded, citing EEOC guidance purportedly supporting its position

that more information was required regarding Plaintiff's disabilities.  AR 494.  Plaintiff was

permitted to telework pending the Agency's receipt of the requested information.  AR 1140.

Plaintiff provided another letter on May 26, 2016, this time from a social worker and

psychotherapist, Felicia Balicer.  Balicer explained that Plaintiff had been "hospitalized at NYU

Medical Center for two weeks for PTSD, depression, anxiety, and bipolar disorder."  AR 507.  She

concluded that Plaintiff "need[ed] time for her body as well as her mind and emotions to adjust to

. . . medication" and "recommend[ed] that [she] avoid the stress in the office she was working in [and] continue working from home 'telecommunicating' [sic] pending further evaluation." *Id.*

In early June of 2016, Plaintiff submitted a formal request for reasonable accommodation. In the form, she listed conditions of "[b]ipolar depression & anxiety"; "PTSD caused/exacerbated by high stress"; "[c]ardiac arrythmias caused/exacerbated by high stress"; "[m]itral valve prolapse"; and "[e]levated blood pressure caused/exacerbated by high stress." AR 509. She asserted that these conditions affected her "[c]ognitive and emotional functioning, communicating, sleeping, breathing, cardiac function, [and] working" and that she could not "fulfill [her] official position and law license requirements to render technically competent fully accurate and candid legal opinions without the requested accommodations" of teleworking until her physicians advised her that she could return to work. *Id.* She elaborated that she "must avoid stress, which is not possible while . . . in the work place," and that she was "unable to travel to and from work" because of fatigue and dizziness caused by medication. *Id.*

On June 23, the Agency's lawyer again requested further specific information about the duration of Plaintiff's impairments; the extent to which they limited her ability to perform job functions; the length of time for which an accommodation would be necessary; the particular workplace stress Plaintiff needed to avoid; and how telework would enable her to avoid that stress. AR 920-21. The lawyer also observed that Plaintiff was able to report to her Fort Hamilton duty in person and enquired whether she had accommodations there that could be adopted for the District office. *Id.* In response, Plaintiff sent a letter from psychiatrist Dr. Nabil Rezk stating:

> Susan V. Wallace is under my care for her diagnosed Bipolar Disorder with Depression, Anxiety and PTSD. I concur that Ms. Wallace may work by tele work [sic] from home, and avoid more stressful activities, pending further treatment and evaluation. Such stress has had an adverse effect on her recovery, and she is still having medication adjustments, and is in a fragile state with a recent in-patient hospitalization.

AR 923.  Plaintiff also emailed Lee on June 29 stating that her "clear request to adjust the work environment for less stress" included "avoidance of the investigation [into her complaints] . . . additional time to perform certain tasks like answering the investigation interrogation"; [and] telework to avoid not only the strenuous stressful commute, but the toxic bullying and rampant verbal and physical attacks on me."  AR 1213-14.

Several times in July 2016, the Agency asked Plaintiff or her counsel to provide additional information and documentation or noted to her that it was awaiting such information.  AR 927 (July 1 email from Agency counsel requesting more information about duration and about Plaintiff's ability to commute to Fort Hamilton and noting in response to Plaintiff's June 29 email to Lee that "avoidance of a supervisor or coworkers is generally not an accommodation that an employer is expected to reasonably provide"); AR 775 (July 8 email from Lee); AR 610 (July 14 email from Lee); AR 641 (July 22 email from Lee).

On July 25, Plaintiff submitted a second letter from Balicer that was dated June 24, which stated:

> Susan was discharged from NYU Medical Center on 5/19/16 where she was hospitalized for two weeks for PTSD, depression, anxiety, and bipolar disorder. They discharged her and found that she could not physically return to work as she finds this environment hostile and negative, not conducive to recovery or work. She reported that the staff made it difficult to do her job as a lawyer.  At this time Ms. Wallace is not medically able to participate in any investigation and answer questions as they are increasing the stress she is experiencing.  I recommend that she remain out of the office until the environment changes.

AR 642-43.  In a July 27 email to Lee, Plaintiff also asserted that that she was not required to "state any impairments" because her conditions were "PER SE . . . qualifying disabilities."  AR 660.  She stated that asking about the nature, duration, and severity of her impairments was "barred by the" ADA because those questions went to whether a qualifying disability existed, an issue that she contended was already settled in her favor.  *Id.*  She further asserted that her impairments were

permanent, which Lee could confirm "by googling PTSD and Bipolar Disorder." *Id.* Finally, she explained that she required telework because of "the severe bullying, violence which STRESS heaped on [her] in the . . . office"; and that "even if [she was] delusional and imagining all of that, it is what [she] believe[s] and feel[s]." *Id.* at 661. Lee responded that it was not possible to "google [Plaintiff's] stated conditions to understand [her] individual need for an accommodation because these conditions affect individuals differently" and again requested that Plaintiff provide more information because Lee had thus far "only been provided with a statement of [her] diagnoses, without any insight as to the impairments or limitations caused." AR 665.

On July 8, Lee informed Plaintiff that she was required to come to the office for two days the week of July 11. AR 775 (email stating that Plaintiff was "required to be present" for mandatory training and was to report to work "one other day during the week to continue to review, gather, etc. documents and to meet with team members"). Plaintiff refused, citing her "medical orders"; stating that she had never been required to meet in person before to prepare a litigation report; that "key members of the team are not at work this week"' and that her litigation lead at headquarters teleworked. AR 2461. She later reiterated that she did not feel safe in the office because of Lee's and McAndrew's purported bullying. AR 608. Based on that statement, Lee communicated her position that temporary telework was no longer reasonable and stated her expectation that Plaintiff would report to work in person pending final determination on Plaintiff's accommodation request. AR 613, 622, 1140, 641 (email from Lee explaining that the temporary telework accommodation had been "cancelled" because of insufficient information "to justify its continuation while the interactive process continues"). Plaintiff did not report to work and requested leave for the end of July. Def. R. 56.1 ¶ 57.

Throughout this period, Plaintiff and Lee unsuccessfully discussed alternate accommodations. According to Lee, Plaintiff rejected her proposals of having a neutral third party present during any meetings between Plaintiff and Lee or McAndrew; changing Plaintiff's arrival and departure times to avoid commuting in rush hour; and of obtaining additional transit check funds to cover express rides to avoid using the subway. AR 610-11, 622-26. Lee, in turn, rejected Plaintiff's proposals of having her adult son be present with her in her office, AR 622; avoiding any interactions between Plaintiff and Lee, AR 611; having Plaintiff work out of the Fort Hamilton office, AR 626; and having a "safety plan" at the office that would require Lee and McAndrew to "admit" that they had harassed Plaintiff, MSPB Tr. at 110:2-112:24, 145:5-16 (Plaintiff's MSPB testimony). Both parties assert that they proposed, and that the other rejected, a potential accommodation of having Plaintiff work part-time remotely and part-time in person. *Compare* AR 722 (August 10 email from Lee stating that Plaintiff had not responded to Lee's earlier proposal of teleworking three days a week), *with* MSPB Tr. at 115:6-117:20 (Plaintiff testifying that in August or September, she proposed going into the office "when needed," which Lee denied).

Also in July 2016, Plaintiff filed her EEO complaint. Def. R. 56.1 ¶ 125. She alleged discrimination on the basis of her age, gender, and disability; it also asserted that she was subjected to reprisal and a hostile work environment based on her opposing discriminatory practices. *Id.*

On August 2, 2016, Plaintiff submitted an additional letter from Balicer and Rezk, which reiterated Plaintiff's diagnoses. AR 698. The letter explained that her conditions were "long-term" and "likely permanent." *Id.* While Balicer and Rezk predicted that "the prognosis for recovery to stable functioning [was] good" assuming treatment compliance and adjustments in Plaintiff's work and lifestyle, they warned that it was impossible to "clearly define a period of time

for [Plaintiff] to adjust." *Id.* The letter concluded that Plaintiff "cannot physically return to work . . . as she finds the work environment hostile and negative"; that she was "not medically able to participate in stressful conversations"; and that "[s]tressors such as strict deadlines should be avoided as much as possible." *Id.* at 699. It further concluded that "distressing information like punishments and other adverse employment actions be sent to [Plaintiff's] lawyer instead of directly to" her to avoid severe stress. *Id.* Overall, the letter recommended Plaintiff work from home "until the [work] environment changes." *Id.*

Upon receiving this letter, Lee authorized further temporary telework pending a final determination on Plaintiff's accommodation request. AR 2478. On August 10, she emailed Plaintiff setting out the essential functions of her position and asking her to confirm Lee's understanding of her conditions, impairments, and limitations. AR 721. Lee explained that Plaintiff could only perform her job effectively by "being in the office and meeting with . . . team members." *Id.* She also expressed her understanding that Plaintiff's providers had "indicated that [she] cannot physically return to work" and that Plaintiff was requesting full-time telework. AR 722. Lee stated her belief that, to fully accommodate Plaintiff's limitations, she would "need to avoid assigning [Plaintiff] matters with deadlines or which may involve stressful confrontations, either with the adversary, client, judge, or arbitrator/mediator"; and that Plaintiff "should not be receiving any distressing information—such as punishments or adverse employment actions—and that Agency counsel would need to direct any such communications" to Plaintiff's lawyer. *Id.* Finally, Lee outlined the alternate accommodations she had proposed and stated that they "do not appear to have been acceptable" to Plaintiff. *Id.* Plaintiff replied that there were "[m]any erroneous premises in this [email that] need correction" and that she would respond further at a later date. AR 723. It is undisputed that Plaintiff never provided that response. Pl. R. 56.1 ¶ 74.

Defendant cites several examples of Plaintiff's purportedly unsatisfactory work while she was temporarily teleworking. First, Defendant states that Plaintiff submitted a report in which she "asserted that dunes could be built in the sea, which the assigned project engineer stated was a physical impossibility." Def. R. 56.1 ¶¶ 75-76, 78; AR 822-23 (email exchange between Lee and Plaintiff). According to Lee, had Plaintiff "been present in the office to meet with the project engineer in person, this miscommunication or misunderstanding may not have occurred." AR 480. Plaintiff responds that she was not given necessary information; she cites in support an email to Lee in which Plaintiff stated that she had been told that the dunes should be built in the water and explained that she did not have coastal engineering training. Pl. R. 56.1 ¶ 76; AR 822-23. Second, Defendant asserts that the Agency had to reassign matters from Plaintiff because of her inability to travel, which Plaintiff does not appear to dispute. AR 480. Third, Defendant states that the Agency had to reassign two tort matters because Plaintiff had failed to respond to inquiries from claimants; Plaintiff rebuts that she had no experience in tort cases but does not cite to portions of the record disputing her failure to respond. Pl. R. 56.1 ¶ 79; MSPB Tr. at 294:14-20 (Plaintiff's MSPB testimony).

### F.    Denial of Plaintiff's Accommodation Request and Plaintiff's Removal

On October 3, 2016, the Agency referred Plaintiff's accommodation request to the Federal Occupational Health Medical Employability Program ("FOH"). Def. R. 56.1 ¶ 80. FOH reviewed Plaintiff's medical letters and "voluminous emails . . . between" Plaintiff and Agency employees but noted that Plaintiff had not provided releases to communicate with her health care providers for further information. AR 1135. FOH concluded that more information was needed to determine whether Plaintiff was suffering from an impairment that substantially limited her ability to work. *Id.* Based on the information that was provided, however, FOH found Plaintiff was not "able to perform the essential functions of her position while working for her current office." AR 1136.

Specifically, FOH found that she was unable to "come into the office to communicate with individuals who are relying on her legal advice" and "unable to perform investigations and answer questions." *Id.* As to whether the Agency could provide alternative accommodations, FOH explained that it was unclear "whether [Plaintiff's] limitations extend beyond working for her current office and thus whether this is even a scenario that should be resolved via a 'reasonable accommodation.'" *Id.* Rather, FOH posited, "[i]f [Plaintiff's] allegations are to be believed, it is more of an issue of unacceptable and possibly even criminal office behavior." *Id.* Plaintiff asserts that FOH was provided an inaccurate list of her job duties, citing an email to Lee observing that the list of documents provided to FOH did not include Plaintiff's position description and speculating that "perhaps" Lee had given an improper description to FOH. AR 1175.

On November 29, 2016, Lee officially denied Plaintiff's request for full-time telework. AR 1137-45. Lee explained that Plaintiff's position "ha[d] a bonafide requirement for face-to-face interaction with supervisors, fellow co-workers and customers" and that full-time telework would not allow Plaintiff to personally attend meetings; directly communicate with supervisors; participate in training; effectively prepare and research reports; or interact with other staff. AR 1142. She further stated that the Agency could not accommodate Plaintiff's impaired ability to interact well with others, be assigned strict deadlines, participate in investigations, or participate in stressful confrontations without removing essential functions of her position. AR 1143. Lee outlined the alternate accommodation proposals she had offered to Plaintiff. AR 1144. She then advised Plaintiff that "subject to any change in [her] medical status . . . action will be taken in the near future to assess and determine [her] ability to remain employed by the Agency," but invited her "to engage in a collaborative effort and discussions to determine if any type of reasonable accommodation would be available." AR 1144.

Lee's determination prompted another flurry of emails in which Plaintiff laid out her objections to Lee's decision. AR 1146-49, 1154, 1156-60. In one of those emails, Plaintiff told Lee, "I need a different supervisor as [a reasonable accommodation] . . . I am not able to tolerate being harassed, criminally threatened and physically bullied, none of which are on my [position description] or authorized conditions of my federal employment." AR 1179. She did not, however, appear to provide additional information about her limitations or abilities or correct any misunderstanding of Lee's as to those issues.

The Agency conducted a search for full-time vacant positions in the New York City area for which Plaintiff was qualified but found none. AR 480. On December 30, 2016, Lee issued a Notice of Proposed Removal for Medical Inability to Perform laying out the same justifications as in the accommodation denial and documenting purported errors in Plaintiff's work. AR 470-80. Daniel Murray, Associate Deputy Chief Counsel, sustained the proposed removal on April 11, 2017. He found that Plaintiff's written and oral replies to the proposed removal had failed to "adequately rebut the determination in the proposed removal memorandum that [her] medical condition render[ed her] unable to perform specified essential functions of [her] position." AR 304. Plaintiff's removal was effective April 15, 2017. Pl. R. 56.1 ¶ 97.

## II. Procedural History

Plaintiff appealed her removal to the MSPB. AR 2585. The Administrative Judge ("AJ") affirmed the Agency's removal and found that Plaintiff had not prevailed on her affirmative defense of failure to reasonably accommodate. Specifically, the AJ found that the Agency had proved, by a preponderance of the evidence, that Plaintiff's medical condition prevented her from safely and efficiently performing the core duties of her position and that no accommodation existed that would have been effective in allowing Plaintiff to perform the essential functions of her position. *See* AR 2612-25 (discussing the applicable burden of proof the Agency had to meet to

sustain its removal action). The AJ considered the potential accommodations of full-time telework, a change of supervisor, and the more moderate accommodations that had been proposed by both parties; she found these accommodations were either incompatible with the essential functions of Plaintiff's job or inconsistent with prior representations by Plaintiff and her medical providers regarding her ability to work in person.

Plaintiff commenced this action on July 19, 2018, at which point her EEOC complaint was dismissed. Def. R. 56.1 ¶ 127. On September 30, 2019, the Court granted in part and denied in part Defendant's motion to dismiss Plaintiff's Amended Complaint. This motion followed.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).[5] "A fact is material if it might affect the outcome of the suit under the governing law," and it is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the moving party has asserted facts showing that it is entitled to judgment, the opposing party must "cit[e] to particular parts of materials in the record" or "show[ ] that the materials cited [by the movant] do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). The Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).

Where, as here, a plaintiff couples discrimination claims with a nondiscrimination claim in response to an adverse MSPB decision, "the entire 'mixed case' is filed in the district court."

---

[5] Unless otherwise noted, case quotations omit all internal citations, quotations, alterations, and footnotes.

*Williams v. McCausland*, 791 F. Supp. 992, 998 (S.D.N.Y. 1992).  "The discrimination claim[s] [are] reviewed *de novo*, while the nondiscrimination claim is reviewed on the administrative record only."  *Id.* (citing 5 U.S.C. § 7703(c)).  The Court may "set aside . . . [the] agency action" only when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "obtained without procedures required by law, rule, or regulation having been followed"; or "unsupported by substantial evidence."  § 7703(c).

## DISCUSSION

### I.  Rehabilitation Act Claim

Plaintiff's Rehabilitation Act claim rests on a failure to accommodate theory.  This "requires a showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006).[6]  "The employee possesses the initial responsibility to inform the employer that [s]he needs an accommodation and to identify the limitation that needs accommodating."  *Schroeder v. Suffolk Cty. Cmty. Coll.*, No. 07-cv-2060 (JFB) (WDW), 2009 WL 1748869, at *14 (E.D.N.Y. June 22, 2009).  Once this occurs, "the responsibility for fashioning a reasonable accommodation is shared between the employer and the employee."  *Id.*  "At this point, the employer must make a reasonable effort to determine an appropriate accommodation based on the particular job involved and consultation with the employee" in what is known as the interactive process.  *Id.*  "An employee who is responsible for the breakdown of [the] interactive process may not recover for a failure to accommodate."  *Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x

---

[6] The parties do not appear to dispute the first or second elements of this test.

943, 946 (2d Cir. 2008).  Because the undisputed facts reflect that Plaintiff was responsible for a breakdown in the interactive process that led to the Agency's denial of her accommodation request, the Court grants summary judgment on this claim.

The Court notes at the outset that the reasonable accommodation framework does not appear to be an ideal fit for this case.  The heart of Plaintiff's claim is not so much that her disabilities prevented her from working in person, but that Lee's and McAndrew's alleged harassment prevented her from working in person.  Indeed, undisputed aspects of the record suggest that Plaintiff would have (or believes she would have) been able to work in person had the purported conduct ceased, regardless of any change in her underlying disabilities.  *See, e.g.*, AR 1179 ("I need a different supervisor as [a reasonable accommodation] . . . I am not able to tolerate being harassed, criminally threatened and physically bullied, none of which are on my PD or authorized conditions of my federal employment."); AR 661 ("As to why I need to do the telework AT HOME versus in the CENAN office is the severe bullying, violence which STRESS heaped on me in the CENAN office."); AR 699 (medical letter stating that Plaintiff could not return to work in person "until the environment changes").  In other words, as the FOH doctor rightly observed, it is "not clear . . . whether [Plaintiff's] limitations extend beyond working for her current office and thus whether this is even a scenario that should be resolved via a 'reasonable accommodation.'"  AR 1136.

The Court thus has hesitations regarding whether the accommodations Plaintiff was seeking were "needed because of [her] disability" and therefore could possibly have been "reasonable." *Scalera v. Electrograph Sys., Inc.*, 848 F. Supp. 2d 352, 362 (E.D.N.Y. 2012) (citing with approval a First Circuit case explaining that "accommodations are only deemed reasonable (and, thus, required) if they are needed because of the disability"); *see also Perkins v. Dep't of the*

*Treasury*, No. 18-cv-8911 (NSR), 2022 WL 19772, at *12 (S.D.N.Y. Jan 3, 2022) (observing that it was "not clear" that a plaintiff's "reasonable accommodations request form requesting she be removed from her department due to stress and anxiety . . . were actually requests for an accommodation based on disability, as Plaintiff generally made these requests based on reported disagreements with her supervisors"). It must, however, take all unsettled facts in her favor. Doing so, a reasonable jury could find that it was Plaintiff's disabilities—her heart conditions, bipolar disorder, depression, anxiety, and post-traumatic stress disorder—that, in conjunction with the alleged harassment she was experiencing, created the need for an accommodation.

A "reasonable accommodation" cannot include the elimination of an essential job function. *Wernick v. Fed. Rsrv. Bank of New York*, 91 F.3d 379, 384 (2d Cir. 1996). When Lee denied Plaintiff's accommodation request, she made two findings. First, she rejected the proposed accommodation of full-time telework because certain essential functions of Plaintiff's job could only be accomplished by working in person. *See* AR 1142 (explaining that Plaintiff's position "has a bonafide requirement for face-to-face interaction" with others). Second—and separately—she concluded that other essential functions of Plaintiff's job, while not necessarily tied to in-person work, involved stressful confrontations, strict deadlines, interacting with others, and conducting investigations—all of which Plaintiff's health care providers had advised should be avoided. AR 1143 (citing Plaintiff's medical letters). When removing Plaintiff, Murray echoed a similar understanding of her limitations, and named physical presence as just one of many essential functions implicated by those limitations. AR 304 (stating that Lee's "proposed removal memorandum addressed [Plaintiff's] limitations, caused by [her] medical condition, to perform a number of essential functions, including: interacting well with others, being physically present in the office, participation in investigation[s], participation in stressful confrontations, performance

under strict deadlines, the ability to concentrate and perform under pressure, and the ability to confer with and take direction from [her] supervisor").   Murray also explained that Plaintiff's objections to her proposed removal "focused mainly on challenging [her] need to be physically present in the office to perform [her] duties . . . [but] did not adequately address [her] ability to perform the essential duties as stated in the proposal memorandum given [her] medical condition[s]."  *Id.* at 305.  In other words, the Agency's denial rested not just on a determination that physical presence was an essential function of Plaintiff's job, but also on a determination that Plaintiff's other limitations prevented the performance of other essential functions, which remote work would not adequately address.

Plaintiff does not appear to dispute that interacting with others, participating in investigations generally, meeting deadlines (including deadlines other than those imposed by courts or other adjudicators), conferring with and taking direction from one's supervisor, and participating in sometimes stressful confrontations are essential functions of her position.  Instead, she argues that the Agency misunderstood her limitations regarding these particular functions by misinterpreting the statements from her treatment providers.  She cites her testimony before the MSBP that the stress she had been told to avoid was the specific harassment she was experiencing, not the generic stress of legal work.  Wallace MSPB Dep. at 373:6-9 (Plaintiff testifying that stressful confrontation "doesn't mean like just having a legal argument with somebody" but "means, in other words, somebody putting you up against the wall and threatening to hit you").  As to participating in investigations, she asserts that Balicer's statement that Plaintiff was "not medically able to participate in any investigation and answer questions" was in reference to the specific investigation that had been launched in response to her complaints, not to any investigation she might have to perform as an attorney.  Opp. MOL at 24.  Finally, she contends that the

deadlines she was told to avoid were not all deadlines, but "arbitrary" deadlines that were set to harass her.  *Id.* at 29, 35.

Even if a reasonable jury could interpret the letters consistent with Plaintiff's narrower reading,[7] Defendant has presented compelling evidence in and apart from these letters that Plaintiff could not perform the essential functions of her position, even while she was temporarily working remotely.  The Court need not, however, decide whether there is a genuine dispute of fact on this issue, because it finds that Plaintiff was herself responsible for any misunderstanding the Agency may have had of her limitations with respect to these indisputably essential functions.

To be sure, "an employer enjoys no blanket shield from ADA liability based on the employer's incorrect belief that no reasonable accommodation could enable the plaintiff employee with a disability to perform his essential job duties."  *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 106 (2d Cir. 2001).  Indeed, the Second Circuit in *Parker* appeared to agree with the proposition that "an employer violates the ADA when it terminates an employee based on the erroneous belief that his disability, even if accommodated, renders him unqualified for the job." *Id.* at 113.  But the court also strongly suggested that when the employee is "himself responsible for [the employer's] misunderstanding of his abilities, and for the breakdown in the interactive process of assessing the feasibility of accommodations," liability cannot lie.  *Id.* at 106.  And an employer's "lack of such knowledge" regarding the true nature of an employee's abilities and limitations "may, in a given case, be symptomatic of plaintiff's responsibility for a breakdown in the interactive process."  *Id.* at 113.

---

[7] Plaintiff's reading presumably relies on the fact that Balicer's letters appear to focus primarily on purported events that occurred in Plaintiff's physical office environment and involving specific individuals.  *See, e.g.*, AR 643 (June 2016 letter warning against Plaintiff "answer[ing] questions"); AR 699 (August 2016 letter stating that the stressful confrontations Plaintiff could not participate in included "face-to-face . . . physical confrontations and yelling, name-calling, accusations, etc."); *id.* (stating that Plaintiff "report[ed] often having to work under deadline pressures which she feels are arbitrarily set by superiors unnecessarily to harass her" and then concluding that "[s]tressors such as strict deadlines should be avoided as much as possible").

Examining the breakdown of the interactive process here shows that this is one of those cases.  "In evaluating a claim for failure to accommodate . . . courts should attempt to isolate the cause of the breakdown of the interactive process and then assign responsibility." *Zito v. Donahoe*, 915 F. Supp. 2d 440, 446 (S.D.N.Y. 2012).  Specifically, courts "should look for signs of failure . . . by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).[8]  Here, it is possible to isolate the cause of the breakdown that allegedly led to the Agency's misunderstanding of certain of Plaintiff's limitations: Lee's August 2016 email predating her reasonable accommodation denial.  In that email, Lee laid out her understanding of Plaintiff's limitations and the accommodations she required, and explicitly asked in the first paragraph of that email for Plaintiff to "confirm [this] understanding or correct any misunderstandings that [she] may have."  AR 721.  She then proceeded to explain her impression, based on Plaintiff's medical letters, that to accommodate her medical conditions, Lee "would need to avoid assigning [her] matters with deadlines or which may involve stressful confrontations"; that "distressing information . . . such as punishments and other adverse employment actions" should be sent to Plaintiff's attorney instead of to her in person; and that Plaintiff's "ability to interact well with others [was] impaired."  AR 722.  Although Plaintiff replied that there were "[m]any erroneous premises" in the email that "need[ed] correction" and that it would "take considerable time to adequately respond," AR 723, it is undisputed that she never provided a

---

[8] Of course, "[i]n a case involving an employee with mental illness, the communication process becomes more difficult," meaning that in some circumstances an employee may terminate the interactive process because of her disability, as opposed to a failure to make reasonable efforts. *See Goonan v. Fed. Res. Bank of New York*, No. 12-cv-3859 (JPO), 2014 WL 3610990, at *7 n.3 (S.D.N.Y. July 22, 2014).  The court in *Goonan*, however, was concerned with the possibility of an employee with mental illness being unwilling or unable to provide information about his disability, a problem that does not appear to be present here.  Moreover, the record here shows not only that Plaintiff communicated frequently and extensively with her supervisor, but that her medical providers and counsel communicated on her behalf as well, thus alleviating any concerns that her disabilities prevented her from participating in the interactive process.

further response, Pl. R. 56.1 ¶ 74.[9]  Moreover, Lee stated in a July 14 email that Plaintiff "appear[ed] to be requesting, as an accommodation, to avoid meeting or interacting with me," AR 611—an understanding that Plaintiff never corrected, and indeed, confirmed when she stated that she needed "a different supervisor as [a reasonable accommodation]," AR 1179.  None of the limitations that Lee described can adequately be addressed through remote work.[10]  Plaintiff now argues that she did not have these particular limitations such that she could have effectively worked from home: even if there is a true factual dispute on this question, she may not prevail on a misunderstanding that she helped to cause and failed to correct.  "Because [Plaintiff] failed to hold up her end of the interactive process by clarifying the extent of her medical restrictions" either when submitting her providers' letters or in response to Lee's misunderstanding, the Agency "cannot be held liable for failing to provide reasonable accommodations" based on that misunderstanding.  *Steffes v. Stepan Co.*, 144 F.3d 1070, 1073 (7th Cir. 1998), *cited with approval in Witchard v. Montefiore Med. Ctr.*, No. 05-cv-5957 (JSR), 2009 WL 602884, at *12 n.18 (S.D.N.Y. Mar. 9, 2009).[11]

---

[9] Plaintiff did write in an earlier email to Lee that her medical providers had advised against only "strict UNNECESSARY ARBITRARY deadlines that you set not something like a court deadline." AR 2476.  But this still clearly conveys the understanding that Plaintiff could not be assigned internal deadlines or client-driven deadlines, which Plaintiff does not dispute is an essential function of her position.

[10] Moreover, to the extent Plaintiff's accommodation request was for a new supervisor rather than remote work, it is well-settled that changing an employee's supervisor is generally not a reasonable accommodation.  *See Wernick*, 91 F.3d at 384.

[11] Given the Court's holding, it is not necessary to determine whether full-time telework would be a reasonable accommodation given Plaintiff's limitations as she currently characterizes them.  The Court notes, however, that many courts have treated remote work like any other accommodation—potentially reasonable depending on the specific requirements of a job and the specific facts of a case.  *See, e.g.*, *Vangas v. Montefiore Med. Ctr.*, 6 F. Supp. 3d 400, 418-19 (S.D.N.Y. 2014); *McMillan v. City of New York*, 711 F.3d 120, 128 n.4 (2d Cir. 2013); *Nixon-Tinkelman v. N.Y.C. Dep't of Health & Mental Hygiene*, 434 F. App'x 17, 20 (2d Cir. 2011) (remanding to the district court to consider whether it would have been reasonable for defendants to have allowed plaintiff to work from home); *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 104 (2d Cir. 2010) (suggesting that employer had provided a reasonable accommodation by allowing an employee to work from home); *Frantti v. New York*, 850 F. App'x 17, 20 (2d Cir. 2021) (holding that the undisputed evidence showed that remote work was not a reasonable accommodation given the plaintiff's job responsibilities); *Hall v. Verizon New York, Inc.*, No. 13-cv-5518 (NRB), 2017 WL 3605503, at *5-6 (S.D.N.Y. July 26, 2017); *Zuckerman v. GW Acquisition LLC*, No. 20-cv-8742 (VEC), 2021 WL 4267815, at *12 n.16

Accordingly, the Court grants summary judgment on Plaintiff's Rehabilitation Act claim.

## III. Title VII Gender Discrimination Claim

Plaintiff next asserts she was discriminated against on the basis of her gender when her work was reassigned to Hayden and when she was terminated. The Court finds that Plaintiff has failed to raise a genuine issue of fact that these adverse actions were taken because of her gender.

The provision of Title VII that applies to federal employees provides that "[a]ll personnel actions affecting employees . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16. The Court analyzes Plaintiff's claim under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[12] "Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by

---

(S.D.N.Y. Sept. 20, 2021); *Goonan v. Fed. Reserve Bank of N.Y.*, 916 F. Supp. 2d 470, 483-84 (S.D.N.Y. 2013); *see also U.S. Equal Employment Opportunity Comm'n, Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the ADA* ¶ 34 (Oct. 17, 2002), http://www.eeoc.gov/policy/docs/accommodation.html#N_101 (explaining that an employer may need to allow an employee to work from home as a reasonable accommodation for that employee's disability depending on the essential functions of the employee's position).

[12] The Court addresses two preliminary points regarding the appropriate legal standard to apply to this claim.

First, in *Babb v. Wilkie*, 140 S. Ct. 1168 (2020), the Supreme Court interpreted the ADEA's federal-sector provision to allow an ADEA claim when age is merely a factor, as opposed to a but-for cause, of an adverse employment action. *Id.* at 1174 (holding that "age must be the but-for cause of *differential treatment*, not . . . a but-for cause of the *ultimate decision*"). On remand, the Eleventh Circuit held that, given the materially identical language in § 2000e-16, *Babb* controlled the analysis of Title VII claims brought by federal-sector employees under that provision as well—and that application of the *McDonnell Douglas* framework was no longer appropriate in such cases. *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1199-1204 (11th Cir. 2021). The Second Circuit has not yet commented on *Babb*'s effect, if any, on § 2000e-16 claims. Given this silence, as well as the fact that neither party urges the Court to follow *Babb* when addressing Plaintiff's VII claim, the Court follows pre-*Babb* Second Circuit caselaw that applies the traditional Title VII standard (and the *McDonnell Douglas* framework) to § 2000e-16 claims. *See, e.g.*, *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008); *Joseph v. Leavitt*, 465 F.3d 87, 93 (2d Cir. 2006). Even if the Second Circuit were to hold that *Babb* changed the § 2000e-16 analysis, the Court's conclusion would not change because, for the reasons stated below, Plaintiff has raised insufficient evidence that any personnel action was "tainted by differential treatment based on" gender, *Babb*, 140 S. Ct. at 1174.

Second, Plaintiff's brief interchangeably cites cases employing *McDonnell Douglas*' "pretext" approach and cases employing the alternative "mixed motive" approach first articulated in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *See Stratton v. Dep't for the Aging for City of New York*, 132 F.3d 869, 878 (2d Cir. 1997) ("The ultimate issue in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an impermissible reason, *i.e.*, a discriminatory reason. A plaintiff may meet that burden by using a mixed-motives analysis or by proving pretext under the three-step analysis first enunciated in *McDonnell Douglas*."). The Court analyzes her gender discrimination claim under *McDonnell*

a preponderance of the evidence a prima facie case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014); *see also Littlejohn v. City of New York*, 795 F.3d 297, 307-08 (2d Cir. 2015).

To establish a prima facie case of discrimination on the first step, a plaintiff must show: (1) that she is a member of a protected class; (2) that she was qualified for the position that she held; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). This burden "is not onerous," and is satisfied if a plaintiff "introduces evidence that raises a reasonable inference that the action taken by the employer was based on an impermissible factor." *Id.*

Considering first the requisite adverse employment action, there appear to have been three discrete reassignments of Plaintiff's work to Hayden: the 2014 reassignment of her EEO labor cases, the February 2016 reassignment of her ACE-IT cases, and the March 2016 removal of Plaintiff from the union contract. Even assuming the 2014 reassignment falls within the Title VII statute of limitations, the Court cannot treat this as an adverse employment action: it is undisputed that Plaintiff was taken off labor and employment work but given more ACE-IT work in exchange,

---

*Douglas* for two reasons. First, Plaintiff's emphasis on the allegedly pretextual nature of Defendant's proffered reasons suggests, on balance, greater reliance on *McDonnell Douglas*. Second, "if [a] plaintiff fails on the *McDonnell Douglas* analysis, [s]he necessarily fails under the mixed-motive analysis." *Crews v. Trustees of Columbia Univ. in City of New York*, 452 F. Supp. 2d 504, 521-22 (S.D.N.Y. 2006). Because Plaintiff's claim fails under *McDonnell Douglas*, it fails under mixed-motive analysis as well. *See Vahos v. Gen. Motors Corp.*, No. 06-cv-6783 (NGG), 2008 WL 2439643, at *5 n.5 (E.D.N.Y. June 16, 2008) ("As there is no difference between the plaintiff's initial burden under *Price Waterhouse* and the plaintiff's ultimate burden under *McDonnell Douglas*, and because the court will now determine whether [the plaintiff] has met his ultimate burden under *McDonnell Douglas*, the court [need] not separately analyze his claims under *Price Waterhouse*."). Indeed, the evidence Plaintiff presents could not survive the first step of the mixed-motive analysis, which requires "evidence *directly reflecting* the alleged discriminatory attitude." *Beauchat v. Mineta*, 257 F. App'x 463, 466 (2d Cir. 2007).

making this more of a shifting of work responsibilities than a one-sided diminishment of those responsibilities. Def. R. 56.1 ¶ 111.[13]  *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) ("An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities.").  Nor is the removal of Plaintiff from the union contract an adverse employment action because it appears to have been limited to that single matter and was not accompanied by "a decrease in pay, significantly diminished responsibilities, or any material changes in the terms or conditions of [her] employment." *Harge v. City of New York*, No. 16-cv-5160 (LJL), 2021 WL 3855305, at *9-10 (S.D.N.Y. Aug. 26, 2021) (finding that removal from specific work assignments or postings, without more, constituted mere "unsatisfactory work assignments" and not an adverse employment action).  That said, the February 2016 removal of ACE-IT work from Plaintiff's desk appears to be a sufficiently major disruption and reduction of responsibility to be materially adverse (as is, of course, Plaintiff's termination).  *See Preda v. Nissho Iwai Am. Corp.*, 128 F.3d 789, 791 (2d Cir. 1997) ("The prohibition against discrimination . . . includes discriminatorily-motivated diminution of duties."); *Lorenzo v. St. Luke's-Roosevelt Hosp. Ctr.*, 837 F. Supp. 2d 53, 67 (E.D.N.Y. 2011) (finding that being stripped of "the main duty of [one's] job" is an adverse employment action).

In any event, given the extremely low burden of establishing a prima facie case, the Court assumes that Plaintiff has done so through her allegations.  Accordingly, the Court turns to step two, at which the burden is "one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000).

Defendant has offered evidence that the February 2016 reassignment of Plaintiff's ACE-IT work to Hayden was made in response to a complaint about difficulties in working with Plaintiff

---

[13] Plaintiff "disputes" this paragraph, but disputes only the reason for the reassignment, not the details of the reassignment.  Pl. R. 56.1 ¶ 111.

31

and concerns with the quality of her work. Such complaints suffice as legitimate, non-discriminatory reasons. *See, e.g.*, *Davies v. New York City Dep't of Educ.*, 563 F. App'x 818, 820 (2d Cir. 2014) (accepting complaints regarding performance as a legitimate, non-discriminatory reason); *Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 336 (S.D.N.Y. 2020) (accepting "frequent complaints" as a legitimate, non-discriminatory reason); *Enyia v. New York City Health & Hosps. Corp.*, No. 16-cv-6344 (RA), 2019 WL 5308896, at *8 (S.D.N.Y. Oct. 18, 2019) (collecting cases finding that complaints from colleagues were legitimate reasons for adverse employment actions). As to Plaintiff's ultimate termination, the Agency has offered evidence that this termination was a result of its decision that no reasonable accommodation could be made. The ultimate correctness of that determination under the ADA does not affect its legitimacy for purposes of Plaintiff's Title VII claim. *Cf. Graves*, 457 F.3d at 188 ("[E]ven if Graves established genuine factual questions as to all elements of his prima facie case of age discrimination, he has not pointed to any record evidence to dispute [the employer's] legitimate reason (so far as the ADEA is concerned) for the alleged adverse employment action . . . [a]lthough the ADA might prohibit adverse employment action against Graves on the basis of his disability, the ADEA protects only against discrimination motivated by age.").

Of course, when a complaint "is itself . . . motivated [by discrimination], an employer cannot rely on such complaints as being nondiscriminatory reasons for their adverse actions." *Joseph v. Owens & Minor Distribution, Inc.*, 5 F. Supp. 3d 295, 314 (E.D.N.Y. 2014), *aff'd*, 594 F. App'x 29 (2d Cir. 2015). But Plaintiff has raised insufficient evidence that Klein's complaint was motivated by gender discrimination. While she argues that his complaint was made in response to her complaining about his prior racist behavior, she cites only to allegations in her unsworn EEO complaint, which are insufficient to raise a genuine issue of fact. AR 213; *see, e.g.*,

*Waddlington v. City of New York*, 971 F. Supp. 2d 286, 292 (E.D.N.Y. 2013) (rejecting unsworn statements that do not attest to the truthfulness of the underlying assertions as competent evidence on summary judgment). Even putting aside this evidentiary deficiency, Plaintiff's arguments about the true reason for Klein's complaint—while undoubtedly serious—do not suggest that *his complaint against her* was motivated by gender discrimination. She therefore fails to defeat Defendant's step two showing, as this Court's "sole concern" for purposes of this claim is "whether unlawful discriminatory animus motivate[d] a challenged employment decision." *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002); *see Johnson v. MacDonald*, 897 F. Supp. 2d 51, 75 (E.D.N.Y. 2012) (finding that plaintiff failed to show that defendant's proffer of numerous customer complaints about plaintiff was a pretextual reason to terminate him where plaintiff "explain[ed] why the customer allegations were without merit" but did "not deny that these allegations were made"), *aff'd sub nom. Johnson v. Just Energy*, 547 F. App'x 71 (2d Cir. 2013); *Risco v. McHugh*, 868 F. Supp. 2d 75, 102 (S.D.N.Y. 2012) ("While plaintiff argues that her behavior during the incidents cited by defendants was appropriate and justified, a plaintiff's factual disagreement with the validity of an employer's non-discriminatory reason for an adverse employment decision does not, by itself, create a triable issue of fact."), *aff'd*, 371 F. App'x 115 (2d Cir. 2010). Similarly, while Plaintiff has raised factual issues regarding the correctness of the Agency's reasonable accommodation determination that led to her removal, those arguments fail to raise any inference that gender motivated that determination.

In the face of these legitimate, non-discriminatory reasons, Plaintiff "must present more than [a] few isolated pieces of contrary evidence to survive summary judgment." *Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 125 (2d Cir. 2008). Although she "is not required to show that the employer's proffered reasons were false or played no role in the

employment decision," she must show "that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb*, 521 F.3d at 138.[14]  Besides the fact that her ACE-IT work was reassigned to a male lawyer, Plaintiff's only other evidence of gender discrimination is her testimony about two discriminatory remarks: (1) that Capowski had stated in emails that she "want[ed] a male lawyer" and (2) that other Agency individuals on the union contract had "wanted a male lawyer . . . and fought that they should have another one of the male lawyers who was not a labor lawyer do the union contract."  Wallace MSPB Dep. at 487:22-488:9. Plaintiff did not testify as to when either of these comments were made.

Although disconcerting, these remarks fail to raise a sufficient inference that Plaintiff's February 2016 work reassignment or her termination were motivated by gender discrimination. "In determining whether a remark is probative" of discriminatory intent, courts "have considered four factors: (1) who made the remark (*i.e.*, a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process)." *Henry v. Wyeth Pharm.*, 616 F.3d 134, 149 (2d Cir. 2010).  Applying this balancing test, Capowski's alleged remark has low probative value: although a reasonable juror could view it as discriminatory, there is no evidence Capowski was a decision-maker or supervisor; nor is there any evidence that this remark was made close in time to or otherwise related to Lee's February 2016 reassignment or recommendation of termination.  Similarly, while the remark about the union contract can certainly be interpreted as discriminatory, there is no evidence regarding

---

[14] To the extent Plaintiff relies on her past positive evaluations to demonstrate pretext, Pl. R. 56.1 ¶ 77, courts in this Circuit have made clear that "demonstration of past positive performance is insufficient to raise a genuine issue of disputed fact with respect to pretext." *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 577 (S.D.N.Y. 2010).

when it was made or any relationship it had to either adverse employment action.  *See, e.g.*, *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 399 (S.D.N.Y. 2013), *aff'd*, 586 F. App'x 739 (2d Cir. 2014) (concluding that remarks did not constitute sufficient evidence to support a case of discrimination when the speaker "was not the plaintiff's supervisor," there was "no evidence that [the speaker] had any input into the [adverse] decision," and there was "no evidence that the comments were related to the decisionmaking process").[15]

Any reasonable inference of gender discrimination is further undercut by the fact that the individual who allegedly took the adverse actions against Plaintiff—Lee—is a woman.  While members of a protected class can certainly discriminate against other members of that class, *see Meyer v. McDonald*, 241 F. Supp. 3d 379, 391 (E.D.N.Y. 2017), *aff'd sub nom. Meyer v. Shulkin*, 722 F. App'x 26 (2d Cir. 2018), courts nonetheless "appl[y] an inference against discrimination" in such circumstances, *id.*; *accord Bauger v. Spanish Broad. Sys., Inc.*, No. 04-cv-8393 (RJS), 2010 WL 2813632, at *11 (S.D.N.Y. July 12, 2010) (collecting cases); *Palak v. St. Francis Hosp.*, No. 14-cv-4383 (JG), 2015 WL 3682805, at *8 (E.D.N.Y. June 12, 2015) ("[I]f a decision maker is in the same protected class as plaintiff, claims of discrimination become less plausible.").  It is also undisputed that the attorney hired to replace Plaintiff was a woman, further weakening her case.  *See Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 452 (S.D.N.Y. 2013), *aff'd sub nom. Dabney v. Bed Bath & Beyond*, 588 F. App'x 15 (2d Cir. 2014).

For all these reasons, the Court concludes that no reasonable jury could find that Plaintiff's evidence supports the reasonable inference that either of the Agency's employment actions were

---

[15] Notably, while this second comment could cast doubt on any reliance by Lee on the Deputy Commander's complaint in her decision to remove Plaintiff from the union contract, *see Joseph*, 5 F. Supp. 3d at 314, the Court has already determined that the removal of this one matter from Plaintiff's desk did not constitute an adverse action.

motivated by gender discrimination in light of Defendant's legitimate and non-discriminatory reasons. Accordingly, summary judgment is granted on this claim.

## IV.   ADEA Claim

Plaintiff also asserts she was impermissibly discriminated against on the basis of her age, again based on the reassignments of her work to Hayden and on her termination. As with her gender discrimination claim, Plaintiff has failed to raise a triable issue of fact as to whether age discrimination played a part in Defendant's treatment of her.

The Court first clarifies the legal standard governing Plaintiff's claim. The ADEA's provision that applies to federal employees states that "[a]ll personnel actions affecting employees . . . who are at least 40 years of age . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a. In *Babb v. Wilkie*, 140 S. Ct. 1168 (2020), the Supreme Court interpreted this language as allowing an ADEA claim when age is merely a factor, as opposed to a but-for cause, of an adverse employment action. In other words, although "age must be the but-for cause of *differential treatment*," it need not be the "but-for cause of the *ultimate decision*"; it is sufficient that a personnel action be "tainted by differential treatment based on age." *Id.* at 1174. On remand, the Eleventh Circuit interpreted *Babb* as instructing that "even when there are non-pretextual reasons for an adverse employment decision . . . the presence of those reasons doesn't cancel out the presence, and the taint, of discriminatory considerations." *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1204 (11th Cir. 2021). The court further concluded that the *McDonnell Douglas* framework is inapplicable to § 633a cases post-*Babb*. *Id.*

*Babb* cannot be reconciled with this Circuit's rule that "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010).

Accordingly, the Court analyzes Plaintiff's § 633a claim under *Babb*'s substantive legal standard. *See In re S. Afr. Apartheid Litig.*, 15 F. Supp. 3d 454, 459 (S.D.N.Y. 2014) ("Lower courts are bound by Second Circuit precedent unless it is expressly or implicitly overruled by the Supreme Court."). The Court will do so, however, using the *McDonnell Douglas* framework, notwithstanding the Eleventh Circuit's reasoning to the contrary. Prior to *Babb*, the Second Circuit regularly assessed ADEA claims—including those brought under § 633a—under *McDonnell-Douglas*. *See Meyer v. Shulkin*, 722 F. App'x 26, 27 (2d Cir. 2018); *Milano v. Astrue*, 382 F. App'x 4, 6 (2d Cir. 2010); *Thompson v. Solis*, 379 F. App'x 71, 73 (2d Cir. 2010). Other courts have continued to do so even after *Babb*. *See, e.g.*, *Patterson v. Comm'r of Soc. Sec.*, 834 F. App'x 737, 738 (3d Cir. 2021) (applying *McDonnell Douglas* to a § 633a claim and affirming summary judgment because the plaintiff had failed to establish that the employer's non-discriminatory reasons for any differential treatment were pretextual, even under "*Babb*'s lower causation standard"); *Agbaosi v. Garland*, No. 20-cv-01123 (JWH) (KKX), 2022 WL 677581, at *13 (C.D. Cal. Jan. 28, 2022); *Kline v. Weichert*, No. 16-cv-262 (RCL), 2020 WL 2615528, at *4 (D.D.C. May 23, 2020), *aff'd sub nom. Kline v. Ahuja*, No. 20-5220, 2021 WL 5537701 (D.C. Cir. Nov. 23, 2021). Nor does there appear to be any inconsistency between *Babb*'s standard and the *McDonnell Douglas* framework—the only difference is that Plaintiff must raise sufficient evidence from which a factfinder could reasonably conclude that "age discrimination was a but-for cause of [any] *differential treatment*," if not "the *personnel decision* itself." *Kline*, 2020 WL 2615528, at *4; *see Babb*, 140 S. Ct. at 1174.

With these standards in mind, the Court considers Plaintiff's evidence supporting her ADEA claim. The "transfer of [long-time] responsibilities" to a younger coworker can create an inference of age discrimination. *See Alejandro v. New York City Dep't of Educ.*, No. 15-cv-3346

(AJN), 2017 WL 1215756, at *13 (S.D.N.Y. Mar. 31, 2017).  Thus, the Court assumes Plaintiff

has met the low burden of stating a prima facie case.  Defendant has met its resulting burden by

providing legitimate and non-discriminatory reasons for the differential treatment Plaintiff

experienced that are unrelated to age: namely, Klein's complaint about her performance and the

Agency's determination, after a months-long interactive process, that no accommodation would

allow Plaintiff to perform the essential functions of her job.  Accordingly, Plaintiff must produce

more than "few isolated pieces of contrary evidence to survive summary judgment." *Richardson*,

532 F.3d at 125.  She has not done so.

As the Court noted above, Plaintiff's arguments about the validity of and motivation behind

the ACE-IT complaint and about the correctness of the Agency's reasonable accommodation

decision do not raise an inference that age discrimination played a part in these events.  *Graves*,

457 F.3d at 188 ("[T]he ADEA protects only against discrimination motivated by age.").  But

Plaintiff also relies on her testimony that in 2015, Lee and McAndrew announced a "new policy,"

supposedly from the Agency's chief counsel, that the Agency was "getting rid of old lawyers" and

"want[ed] young lawyers."  Wallace Dep. at 157:21-158:13, 159:1-5.[16]  She asserts that this

statement was made in front of "everybody in the office."  *Id.* at 162:14.  Lee and McAndrew deny

ever making such statements.  Doud Dec. Ex. B at 148:23-149:10; *id.* Ex. F at 37:16-38:7.

It is true that these purported policy descriptions have some probative value under *Henry*'s

balancing test.  *See* 616 F.3d at 149.  There is no question that a reasonable juror who were to

credit Plaintiff that the remarks were made could view them as discriminatory.  The statements

---

[16] Defendant argues that Plaintiff cannot survive summary judgment with this "self-serving" statement, absent direct or circumstantial evidence supporting the claim.  But "[a] single witness's sworn testimony, if believed by a jury . . . is enough to raise a genuine issue of fact precluding summary judgment."  *Bradshaw v. City of New York*, 855 F. App'x 6, 9 (2d Cir. 2021) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 78 (2d Cir. 2001); *accord Owens v. New York City Hous. Auth.*, 934 F.2d 405, 410 (2d Cir. 1991) (concluding that the argument that a plaintiff's assertions were "uncorroborated and not credible is a jury argument inappropriate on a motion for summary judgment").

also describe what appears to be an official policy, as opposed to mere "stray" remarks.  The relevance of the speaker's identity is inconclusive: although the remarks were purportedly made by Lee, the decisionmaker on Plaintiff's reassignment and termination, she appeared to have been transmitting policy directives rather than expressing her personal views.  Finally, the statements occurred over a year before the relevant personnel actions; that said, a policy of "getting rid of old lawyers" has a logical relationship to a decision to terminate a lawyer over the age of 40.

Even if these remarks supply some evidence of a discriminatory policy, though, a reasonable juror could not find that age discrimination was the but-for cause of the Agency's treatment of Plaintiff specifically, either in connection with her work reassignments or in connection with her termination.  In the face of Defendant's abundant evidence of legitimate and non-discriminatory motivations behind those actions, Plaintiff has presented only her own disputed testimony about Lee's and McAndrew's remarks; she has not supplemented those "isolated pieces" of contrary evidence with any other facts, despite the fact that the entire office purportedly heard these statements.  Moreover, the only evidence that this "policy" was ever effectuated is Plaintiff's own termination.  But again, the record establishes that the Agency terminated her as a result of its reasonable accommodation determination—a months-long process during which no explicit or implicit reference was made to the purported policy or to Plaintiff's age.  Also relevant is that Lee is three years older than Plaintiff, which, when considered together with the fact that the alleged remarks did not express her personal views, counsels against the inference that her own actions were tainted by discrimination.  *See Meyer v. McDonald*, 241 F. Supp. 3d 379, 391 (E.D.N.Y. 2017).  Given those countervailing factors that inform the reasons for Plaintiff's termination, any remarks made in 2015 about a discriminatory policy simply do not have a "demonstrated nexus to the complained of personnel actions"—or to any differential treatment in relation to those

actions—such that Plaintiff may "defeat . . . summary judgment." *O'Connor v. Viacom Inc./Viacom Int'l Inc.*, No. 93-cv-2399 (LMM), 1996 WL 194299, at *5 (S.D.N.Y. Apr. 23, 1996), *aff'd*, 104 F.3d 356 (2d Cir. 1996) (concluding that a plaintiff had failed to demonstrate that her supervisor's use of an ethnic slur and remark that people of that ethnic group were "like animals" was sufficient evidence to survive summary judgment when the "record [was] replete with evidence indicating [her] poor job performance" and when there was no nexus between those remarks and the her termination).

Accordingly, the Court grants summary judgment on Plaintiff's ADEA claim.[17]

## V.     Hostile Work Environment Claim

In its prior opinion, the Court concluded that Plaintiff had alleged she suffered a hostile work environment in retaliation for unspecified "complaints" she had made—but that she had not adequately alleged an age- or gender-based hostile work environment.  2019 Opinion at 21-22. The Court further found that the relevant facts supporting a retaliatory hostile work environment claim consisted of the allegations that Lee and McAndrew accosted Plaintiff during the April and May 2016 meetings and that Lee continued to harass Plaintiff afterwards.  *Id.* at 23-24.  The Court now grants summary judgment on this claim because, on a more developed record, Plaintiff has failed to raise a genuine issue of fact that the alleged conduct during the meetings occurred in retaliation for protected activity or that Lee's subsequent behavior rose to the level of severe or pervasive.

"To survive summary judgment on a claim of retaliatory hostile work environment asserted under Title VII . . . a plaintiff must satisfy the same standard that governs hostile workplace claims" by producing "evidence demonstrating that the incidents of retaliation following the protected

---

[17] Plaintiff also asserts that the Agency's Honors Program for entry-level attorneys is evidence of age discrimination. Wallace Dep. at 160-1:9.  But, as Defendant points out, that program has no age restrictions.  Doud Dec. Exs. H1, H2.

activity were sufficiently severe or pervasive to have altered the conditions of her employment." *Rueda v. City of New York*, No. 11-cv-5248 (VSB), 2017 WL 4221081, at *11 (S.D.N.Y. Sept. 21, 2017). "[T]he conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 321. A plaintiff must also show that the hostile environment occurred because of "protected activity." *Davis v. City of New York*, No. 09-cv-0669 (HB), 2010 WL 3895578, at *3 n.3 (S.D.N.Y. Oct. 5, 2010) (citing *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000)); *see also Hurd v. New York City Health & Hosps. Corp.*, No. 07-1250, 2008 WL 5120624, at *2 (2d Cir. Dec. 8, 2008). "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 466 (S.D.N.Y. 2006); *see Turner v. NYU Hosps. Ctr.*, 784 F. Supp. 2d 266, 284 (S.D.N.Y. 2011), *aff'd*, 470 F. App'x 20 (2d Cir. 2012) ("A protected activity includes the filing of formal charges of discrimination as well as informal protests of discriminatory employment practices, including making complaints to management."). A causal connection between an adverse action and protected activity may be established "(l) indirectly, by showing that the protected activity was followed closely by discriminatory treatment . . . or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon*, 232 F.3d at 117.

The Court previously found that Plaintiff had alleged protected activity by "repeatedly assert[ing] that she made complaints to her supervisors and to the EEO concerning alleged discrimination and harassment." 2019 Opinion at 19 (citing Compl. ¶¶ 47, 48, 52, 136-37). The Court further found that Plaintiff had alleged a causal connection between those complaints and the April and May meetings. Although it was not "entirely clear whether Lee and McAndrew's

remarks about what Wallace 'told federal law agents' were referring to Wallace's complaints of discrimination—as opposed to other conduct that she complained about, seemingly outside the scope of Title VII," the Court drew all inferences in Plaintiff's favor to conclude that Plaintiff had alleged that what she "told federal law agents" was, in fact, protected.  *Id.* at 20.

On summary judgment, however, Plaintiff admits that her "allegation that Lee and McAndrew asked her at the April 20, 2016, and May 2, 2016 meetings what she told law enforcement officers . . . pertain[ed] to Plaintiff's prior reports of alleged crimes including contract fraud, procurement fraud, and assorted other crimes."  Pl. R. 56.1 ¶ 122; Wallace Dep. at 105:17-106:16 (testifying that when Lee and McAndrew asked Plaintiff "who [she] talked to about them" and "who [she] told," they were referring to her reports of "contract fraud, procurement fraud, and assorted other crimes to facilitate it").  Indeed, Plaintiff herself connects Lee's and McAndrew's alleged statements to her prior fraud complaints, Opp. MOL at 21-22, and affirmatively states that at "no time during [the May] incident did McAndrew or Lee ever discuss Wallace's complaints of discrimination and harassment," *id.* at 22.  Reporting fraud is not protected activity; therefore, these incidents cannot support Plaintiff's hostile work environment claim.[18]

By contrast, a reasonable jury could find that Plaintiff's March 31, 2016 email constituted protected activity because it stated that Lee was "not accommodating [her] illness," and thus could plausibly be read as making a reasonable accommodation request.  AR  2413-14; *see Sughrim v. New York*, 503 F. Supp. 3d 68, 98 (S.D.N.Y. 2020) (stating that requesting an accommodation is protected activity).  Plaintiff asserts that after this email, Lee responded by "repeatedly requesting additional medical documentation" regarding Plaintiff's disabilities; "suspending [her] under false

---

[18] Although Plaintiff's statement of facts in her brief is replete with vague assertions that she engaged in protected activity for years by complaining formally and informally about the Agency's discrimination, *see* Opp. MOL at 2-33, she makes no attempt to either specify what statutorily prohibited discrimination she was opposing or causally connect that activity to these two incidents.

allegations that she was insubordinate" during the March 24 meeting; "tak[ing] away almost all of [her] work"; "order[ing] [her] to return to the office, despite her medical instructions"; "micromanag[ing]" her while she was teleworking "such as requiring her to check in every five (5) minutes and advising her when her computer started and stopped updating its software"; and ultimately revoking her ability to telework and terminating her.  Opp. MOL at 44.[19]

Several of the purportedly hostile acts Plaintiff describes lack a sufficient causal connection to her March complaint.  First, although Plaintiff's suspension occurred after her March 31 email, and although there is a genuine dispute as to whether she was insubordinate during the March 24 meeting, Lee documented several other justifications for the suspension.  *See* AR 1625-26; Lee Decl. ¶ 15 (asserting that Plaintiff had acted disrespectfully, created a disturbance that had frightened another employee, and failed to follow instructions about where to direct complaint emails).  Not only does Plaintiff fail to dispute these other justifications, but they all occurred before March 31, weakening the inference of a causal connection between her complaint and the suspension.  Second, Lee's initial response to Plaintiff's accommodation request was to *authorize* temporary telework pending a final decision.  AR 1140.  She revoked this temporary permission based on Plaintiff's purported delays in providing documentation and on her statements that she needed to work remotely to avoid interacting with Lee, which Lee saw as insufficient justification for temporary telework.  *Id.*  And she reinstated Plaintiff's temporary telework in August after

---

[19] Plaintiff's March 31 email also complained that Lee was retaliating against Plaintiff for her February 22 email, in which Plaintiff complained about "the Office's failure to follow proper policies, the misconduct detailed above regarding the Office's harassment of Wallace for trying to perform her duties, and taking away more of Wallace's job responsibilities."  Although these complaints certainly implicate misconduct by other Agency employees, without further evidence detailing this email's contents, a reasonable jury could not find that these complaints were protesting *unlawful discrimination*, as opposed to failure to follow EEO procedures, ethical violations, fraud, or other non-discriminatory misconduct.  Indeed, the only clear assertion in Plaintiff's Rule 56.1 statement that she protested discrimination against anyone other than herself is in reference to her complaint about the ACE-IT Chief of Staff's use of a racial slur and discriminatory treatment of employees.  But, as noted above, Plaintiff supports this statement solely by citing her EEO complaint allegation, which is not competent evidence on summary judgment.

receiving further documentation. *Id.* Lee's temporary revocation cannot be reasonably construed as retaliation for Plaintiff's accommodation request given her initial permission for temporary telework. Third, the reassignments that occurred after March 2016 appear limited to Lee's reassignment of a few cases based on Plaintiff's inability to travel or her failure to respond to tort claimants' inquiries—and Plaintiff disputes neither of these non-retaliatory explanations, beyond an unresponsive assertion that she had little experience with tort cases. Def. R. 56.1 ¶¶ 77, 79; Pl. R. 56.1 ¶¶ 77, 79. Finally, Lee's proposed termination occurred months after Plaintiff's March 31 email, and was the product of nearly a year of unsuccessful negotiations regarding reasonable accommodations during which Lee expressed no retaliatory animus whatsoever. *See Gordon*, 232 F.3d at 117.

Thus, the question becomes whether a reasonable jury could find that Lee's request for additional documentation and her demand that Plaintiff check in every five minutes while teleworking were sufficiently severe and pervasive to alter the conditions of Plaintiff's employment. Considering these actions in their totality—including their "frequency," their "severity," their "threatening or humiliating" nature, and whether they "unreasonably interfere[d] with [Plaintiff's] work performance," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)—the only reasonable answer can be no. Lee's requests for documentation, which occurred only a handful of times, cannot be plausibly interpreted as hostile. Nor could a reasonable jury find that Lee made the requests in a hostile manner; to the contrary, her emails were consistently professional in tone. *See, e.g.*, AR 610, 641, 775. Finally, although Plaintiff may well have subjectively perceived Lee's attempted micromanaging as severe or pervasive, no reasonable person would find it severe or pervasive, either alone or in combination with Lee's documentation requests—particularly given that this "micromanaging" appeared to consist of an isolated order

from Lee that Plaintiff did not follow.  MSPB Tr. at 609:25-610:2 (Plaintiff testifying, "I was under an order from her on telework, that I had to check in with her every five minutes.  And I said I can't do that.").  Of course, harassing orders that are not followed may still create a hostile work environment.  But on this record, the Court cannot conclude that a reasonable jury would find that these actions materially altered the conditions of Plaintiff's employment.

Accordingly, summary judgment is granted on Plaintiff's hostile work environment claim.

## VI.   WPA Claim

Finally, Plaintiff brings a claim under the Whistleblower Protection Act, which makes it unlawful to take a personnel action because of "any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences . . . any violation of any law, rule, or regulation."  5 U.S.C. § 2302(b)(8).  A district court does not have jurisdiction to review a WPA claim that was not raised before the MSPB.  *See Kerr v. Jewell*, 836 F.3d 1048, 1053-54, 1058 (9th Cir. 2017); *see also Sistek v. Dep't of Veterans Affairs*, 955 F.3d 948, 953 n.1 (Fed. Cir. 2020) ("A party in an MSPB proceeding must raise an issue before the administrative judge if the issue is to be preserved for review in this court.").  Plaintiff attempted to raise a WPA defense in her appeal, but the AJ concluded that Plaintiff had failed to timely raise such a defense and therefore declined to address it.  AR 2609-10.  Although this presents a close question, the Court finds that this decision was error even under the deferential standards of § 7703.  Accordingly, the Court vacates the AJ's initial decision and remands for consideration of Plaintiff's WPA defense.

The administrative record indicates that Plaintiff mentioned, by statutory citation, a WPA affirmative defense in her initial appeal.  *See* AR 9 (May 8, 2017 appeal form stating that the "Agency's actions were in violation of 5 U.S.C. 2302(b)(8)-(9) [the WPA]").  In a September 25 order, the AJ stated that "[a]ffirmative defenses not sufficiently pled by November 6, 2017 will be

deemed waived," explained that Plaintiff "ha[d] asserted the affirmative defense of failure to accommodate a disability," and ordered that she "plead facts sufficient to meet her initial burden on this and any other affirmative defense no later than November 6, 2017." AR 1245. Plaintiff responded to this order by submitting a pleading on November 6 providing disclosures for her reasonable accommodation affirmative defense. AR 1371-73. The pleading did not discuss facts relevant to a WPA defense.

Plaintiff later requested additional time to file submissions. AR 1384. On November 13, the AJ granted a limited extension but stated that Plaintiff was "mistaken in her assertion that the case concerns 'several claims and affirmative defense[s]" and clarified that "the only issues to be heard are (1) whether the agency can prove its one charge, (2) whether removal was a reasonable penalty, and (3) whether the appellant can demonstrate that she would not have been removed but for the agency's failure to reasonably accommodate her." *Id.* Plaintiff did not object to this order.

On November 16, Plaintiff filed a statement of disputed issues that listed as an issue "[w]hether the Agency reprised against Appellant for her protected communications under the Whistleblower Protection Enhancement Act, and the removal was in whole or part unlawful reprisal." AR 1392. The AJ, however, rejected this filing as untimely. AR 1636. At the November 20 pre-hearing conference, the AJ stated again that no issues would be heard other than (1) the issue of removal and (2) whether Plaintiff could prove her reasonable accommodation defense. AR 2609. Plaintiff did not appear to contemporaneously object to this statement. *Id.*

In the November 21 order and summary following that conference, the AJ explicitly found that Plaintiff had not preserved a WPA defense. AR 1648 (order stating that "appellant did not preserve any affirmative defense other than the reasonable accommodation failure in response to my affirmative defense order," including any "whistleblower reprisal claims"). Plaintiff objected

to that order on November 27, arguing that dismissal of her WPA defense was "contrary to the MSPB Judges Handbook, [her] Due Process rights, and an abuse of discretion." AR 1672. The AJ rejected these arguments and concluded that Plaintiff had waived any reasonable accommodation affirmative defense. AR 2609-10.

Any defense a party "fail[s] to affirmatively plead" before the MSPB is "waived." *Stearn v. Dep't of the Navy*, 280 F.3d 1376, 1381 (Fed. Cir. 2002). "[A] defense is timely raised at any point before the end of the conference held to define the issues in the case." *Id.* at 1380 (citing 5 C.F.R. § 1201.24(b)). "An appellant may not raise a new claim or defense after that time, except for good cause shown." § 1201.24(b). The MSPB has appeared to interpret § 1201.24(b) as stating that an appellant abandons a claim or defense only after she fails to object to the MSPB's summary of a prehearing conference that does not include a particular claim or defense. *See, e.g.*, *Buie v. Off. of Pers. Mgmt.*, 94 M.S.P.R. 595, 603 (M.S.P.B. Sept. 30, 2003), *aff'd*, 386 F.3d 1127 (Fed. Cir. 2004) ("By failing to object to the prehearing summary on the grounds that it excluded her discrimination claim, despite ample opportunity to do so, the appellant abandoned that claim."); *Yovan v. Dep't of Treasury*, 86 M.S.P.R. 264, 266 (M.S.P.B. July 5, 2000) ("[A]n appellant is deemed to have abandoned a discrimination claim if it is not included in the list of issues in a prehearing conference summary, or status conference summary, *and the party was afforded an opportunity to object to the conference summary*.") (emphasis added). Moreover, "when an appellant raises an affirmative defense in an appeal either by . . . identifying an affirmative defense by name . . . or by alleging facts that reasonably raise such an affirmative defense, the administrative judge must address the affirmative defense(s) in any close of record order or prehearing conference summary and order." *Wynn v. U.S. Postal Serv.*, 115 M.S.P.R. 146, 149-50 (M.S.P.B. Nov. 2, 2010). "The Board has consistently required administrative judges to apprise

an appellant of the applicable burdens of proving a particular affirmative defense, as well as the kind of evidence the appellant is required to produce to meet his burden." *Id.* at 151.

Although there is no doubt that the AJ acted commendably in giving Plaintiff multiple warnings and opportunities regarding affirmative defenses in general, the Court finds that Plaintiff timely raised her WPA defense such that it must have been specifically addressed. Plaintiff's appeal effectively identified such a defense "by name" by citing the statutory provision. AR 9. This generally obligates AJs to provide specific instructions regarding pleading that affirmative defense. *See Wynn*, 115 M.S.P.R. at 150 ("Although the appellant noted his affirmative defenses on his appeal form . . . the administrative judge did not give him notice of the burdens and elements of proof for any affirmative defenses."). The record does, however, not reflect any such notice; indeed, in Plaintiff's objections to the prehearing conference summary, she stated that she had not been informed of any pleading requirements for her WPA defense. AR 1675 ("I have not been provided or informed of any particular pleading requirements, models, with the possible exception of a few questions the AJ posed to me, *pro se*, in her Scheduling Order, but about only one of my affirmative defenses (denial of reasonable accommodation), which I answered timely."). Even putting aside Plaintiff's initial identification of a WPA defense, "a defense is timely raised at any point before the end of the [prehearing] conference." *Stearn*, 280 F.3d at 1380; *accord Buie*, 94 M.S.P.R. at 603 (holding that a claim is abandoned only when an appellant "fail[s] to object to the prehearing summary" that excludes a claim). The AJ's conference summary states that Plaintiff "suggested . . . whistleblower reprisal claims" during the prehearing conference, AR 1648, thus indicating it was timely raised.

Accordingly, the Court remands Plaintiff's MSPB case for the AJ to adjudicate her WPA affirmative defense.  "On remand, the [AJ] shall apprise [Plaintiff] of the applicable burdens and elements of proof on" that defense.  *Wynn*, 115 M.S.P.R. at 151.

"An adverse action is sustainable only if the appellant cannot establish [her] affirmative defenses."  *Hall v. Dep't of Transp.*, 119 M.S.P.R. 180, 184 (M.S.P.B. 2013).  "Here, it would be premature . . . to consider" most of the AJ's existing findings when the AJ did not adjudicate Plaintiff's WPA defense.  *Id.* (explaining that it would be premature to consider the AJ's nexus and penalty findings).  Accordingly, the Court vacates and remands for consideration of that defense.  *See id.*; *Yovan*, 86 M.S.P.R. at 266 (remanding for consideration of an affirmative defense and "hold[ing] in abeyance [the] consideration of the merits of" a petition for review).

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted except as to Plaintiff's MSPB appeal, which is remanded.  The Clerk of Court is respectfully directed to terminate the motion at docket number 124 and to close this case.

SO ORDERED.

Dated: March 31, 2022
New York, New York

_____
Hon. Ronnie Abrams
United States District Judge

49